**ROMEO COMMUNITY SCHOOLS, a Public Body Corporation, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE et al., Defendants,**

**Susan K. Garrard, Intervenor.**

**Civ. A. No. 6–71438.**

United States District Court, E. D. Michigan, S. D.

April 7, 1977.

Clark, Hardy, Lewis, Fine & Asher, P. C. by Charles L. Fine, E. Peter Drolet, Birmingham, Mich., Steptoe & Johnson by Janet Lammersen Kuhn, Washington, D. C., for plaintiff.

U. S. Dept. of HEW, Office of Civil Rights by Julia C. Lamber, Washington, D. C., U. S. Dept. of Justice by William Z. Elliott, Washington, D. C., Pamela J. Thompson, Asst. U. S. Atty., Detroit, Mich., for defendants.

Beer, Boltz & Bennia by Warren J. Bennia, Bloomfield Hills, Mich., for intervenor.

## MEMORANDUM OPINION

FEIKENS, District Judge.

This is an action for declaratory judgment and permanent injunction, brought under 28 U.S.C. § 2201 and the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, by plaintiff Romeo Community Schools (Romeo) against defendant Department of Health, Education, and Welfare (HEW).[1] Plaintiff challenges the authority of defendant to promulgate certain administrative regulations under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, governing sex discrimination in federally funded education programs. Specifically, plaintiff challenges the legality of the regulations contained in 45 C.F.R. Part 86, Subpart E, § 86.51, *et seq.*, which purport to regulate sex discrimination in the employment relationship between federally funded public schools and their teacher employees. The case is before the court on cross-motions for summary judgment.[2]

### I.

Plaintiff Romeo Community Schools is a Third Class School District duly organized under the laws of the State of Michigan. Romeo operates a public school system in Macomb and Oakland Counties, Michigan, with a total student enrollment currently of 5,092. Romeo currently employs 244 teachers and operates under a budget in fiscal 1976 of $7,210,000.

Plaintiff receives federal funds through the defendant HEW for a number of its educational programs. For the last three years, Romeo has received funds earmarked for preschool and elementary remedial reading programs under Title I. 20 U.S.C. § 241 a–m. Under Title II, Romeo received federal funds for the purchase of library books and other learning materials. 20 U.S.C. § 821, *et seq.* Romeo participates in a federally funded Vocational Education Program with three other Macomb County School Districts and operates two such programs of its own, all at the secondary level. 20 U.S.C. §§ 1241–1391. Plaintiff has also received funds for the last three years under the National School Lunch Act, 42 U.S.C. § 1751, *et seq.*, which provides free milk to disadvantaged students. This federal financial aid to Romeo totaled $45,240 for the 1973–74 school year, $92,351 for the school year 1974–75, and $114,949 for the last school year, 1975–76. Though significant, these figures actually represent only a small fraction of Romeo's total budget—approximately 2% in 1976.

As a recipient of this federal aid, Romeo is subject to Title IX of the Education Amendments of 1972. 20 U.S.C. § 1681, *et seq.* Section 1681 of the Act prohibits sex

---

1. Plaintiff's complaint names both the United States Department of Health, Education, and Welfare and its Secretary, F. David Matthews, as party defendants. Since both defendants are, in effect, the same party for the purpose of the instant suit, this opinion will refer to only one defendant, denominated as either "HEW" or "The Secretary".

2. A hearing was held on these motions February 8, 1977. By agreement of both plaintiff and defendant, a motion to intervene by Ms. Susan K. Garrard, a counselor in the Romeo school system, was granted. The court has had the benefit of excellent briefs and oral arguments from all parties.

discrimination in federally funded education programs:

(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

Under § 1682, the Department of HEW is empowered to investigate reported violations of Title IX and to initiate administrative proceedings to enforce compliance if voluntary compliance cannot be secured.[3] Refusals to comply can be sanctioned under § 1682 with a termination of federal aid of those programs affected by a school's discriminatory policies. Section 1682 provides the Secretary's only means of enforcing § 1681.

Under § 1682, the Secretary of HEW is also authorized to promulgate "rules, regulations, or orders of general applicability," to effectuate the provisions of § 1681, and pursuant to this authority, the Secretary has promulgated a comprehensive set of regulations, 45 C.F.R. § 86.1, *et seq.*, which governs the conduct of federally assisted schools in a number of specific areas. Subpart E of these regulations, 45 C.F.R. §§ 86.51–86.61, purports to regulate the conduct of Title IX schools toward their teacher employees. Subpart E covers a wide range of employment practices, including recruitment, advertising, and pre-employment inquiries, §§ 86.53, 86.59, 86.60; employment criteria, § 86.52; employee compensation and fringe benefits, §§ 86.54, 86.56; and job classification and structure, § 86.55. These regulations, according to § 86.51, apply to employment practices in all programs operated by federally assisted public schools. The focus of this litigation is 45 C.F.R. § 86.57, which requires all federally assisted schools to treat pregnancy equally with sickness and disability for purposes of leave and compensation benefits:

§ 86.57 Marital or parental status

(a) *General.* A recipient shall not apply any policy or take any employment action:

(1) Concerning the potential marital, parental, or family status of an employee or applicant for employment which treats persons differently on the basis of sex; or

(2) Which is based upon whether an employee or applicant for employment is the head of household or principal wage earner in such employee's or applicant's family unit.

**3.** § 1682. Federal administrative enforcement; report to congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

(b) *Pregnancy.* A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom.

(c) *Pregnancy as a temporary disability.* A recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy, and recovery therefrom and any temporary disability resulting therefrom as any other temporary disability for all job related purposes including commencement, duration and extensions of leave, payment of disability income, accrual of seniority and any other benefit or service, and reinstatement, and under any fringe benefit offered to employees by virtue of employment.

(d) *Pregnancy leave.* In the case of a recipient which does not maintain a leave policy for its employees, or in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy, a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom as a justification for a leave of absence without pay for a reasonable period of time, at the conclusion of which the employee shall be reinstated to the status which she held when the leave began or to a comparable position, without decrease in rate of compensation or loss of promotional opportunities, or any other right or privilege of employment.

Romeo is in apparent non-compliance with this regulation. The collective bargaining agreement between Romeo and the Romeo Education Association, the bargaining representative for Romeo's faculty employees, specifically provides that pregnancy and maternity leave shall not be treated equally with sickness and disability leave. Article XX of the union contract provides that pregnancy leave may not be charged against accrued sick leave and is not compensable, either in salary or retirement credits. Furthermore, teachers are required to begin their pregnancy leave by the eighth month of pregnancy, unless they have the permission of their physician allowing them to complete the last two weeks of a marking period, and teachers may not return to work prior to the commencement of the post-natal period or post-natal examination without express medical permission.[4]

On February 4, 1976, a complaint was filed with HEW by Susan K. Garrard, a high school counselor in the Romeo system, alleging sex discrimination in Romeo's pregnancy leave employment policy.[5] An

---

4. Article XX of Romeo's current collective bargaining agreement provides:

1. It is understood that pregnancy is not a sickness or injury and is not applicable under the sick leave provisions of this Agreement.
2. All teachers who become pregnant shall be granted leave of absence. No salary will be received during the time of maternity leave. Schedule increment adjustments, salary and retirement credit are not allowed for such a leave.
3. All pregnant teachers shall be required to commence the leave of absence no later than the end of the eighth month of pregnancy, unless they have their medical physician's approval which would allow them to complete the last two weeks of a marking period.
4. No teacher is permitted to return to work until (a) a conclusion of the post-natal period or post-natal examination, (b) without written authorization that the teacher is physically able and capable of performing all duties and functions of the job and does not create an exposure of liability or employment risk. Otherwise, the normal return from a maternity (and child care) leave shall be the commencement of the next marking period or next school year, whichever is administratively applicable.
5. When the teacher reports to her supervising Principal or Administrator that she is pregnant, she will also file a letter with same Administrator that she holds the school district harmless and without liability in the event she or the unborn fetus shall be injured as a result of working with students in the completion of her duties.

5. A class action suit, brought as a private cause of action under § 1681, has been initiated against plaintiff Romeo in the Federal District Court for the Western District of Michigan regarding this same pregnancy leave policy. *Darlene Thompson, et al. v. Romeo Bd. of Education, et al.,* 12 FEP 1700 (W.D.Mich.1976). Susan Garrard is a member of the plaintiff

investigation ensued, and on June 9, 1976, HEW's Regional Director for Civil Rights issued a letter to plaintiff citing Romeo for non-compliance with 20 C.F.R. § 86.57, and hence non-compliance with Title IX. In response, by letter dated June 24, 1976, plaintiff noted a "serious question" as to HEW's authority under Title IX to regulate the employment practices of federally assisted schools. "It would appear," wrote plaintiff, "that HEW's legislatively conferred authority under this Title would extend only to the persons who are the objects or beneficiaries of federally funded programs, i. e., the students." Plaintiff was given until June 26, 1976 to provide assurances that its practices would be brought into compliance with the regulation. This deadline was later extended to July 9, 1976; on July 9, this suit was commenced.[6]

## II.

The court is faced at the outset with a motion to dismiss by the defendant, who challenges plaintiff's complaint on grounds of ripeness, failure to exhaust administrative remedies, and lack of subject matter jurisdiction. Defendant's ripeness argument is bottomed on the fact that administrative enforcement proceedings have not yet been completed in this case. The Administrative Procedures Act only provides for review of "final agency action," 5 U.S.C. § 704, and HEW argues that no such final action has yet been taken here, since none of Romeo's federal funds have yet been terminated. *Board of Education of the City of Cincinnati v. Dept. of HEW,* 396 F.Supp. 203, 248–49 (S.D.Ohio 1975). Indeed, there is as yet no final determination of non-compliance with Title IX by the Secretary. As a prerequisite to any judicial review of this matter, defendant contends that such a determination should be made. *Toilet Goods Assoc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *DuBois v. Clark,* 389 U.S. 309, 88 S.Ct. 450, 19 L.Ed.2d 546 (1967).

HEW also contends that plaintiff is bypassing its administrative remedies by the premature commencement of this suit. *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). It is defendant's position that the issues raised in plaintiff's complaint should first be addressed to HEW in the context of enforcement proceedings, so that HEW can utilize its expertise in this field to make an initial ruling on plaintiff's claims. *Best v. Humbolt Placer Mining Co.,* 371 U.S. 334, 338, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *United States v. Philadelphia Nat. Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). At the very least, defendant argues that a thorough factual record should be made at the administrative level, so that HEW's authority to regulate employment practices under Title IX and plaintiff's legal challenges to that authority

class in this suit. The action is currently pending.

**6.** Initiation of this suit did not abate enforcement proceedings. By letter dated August 31, 1976, Romeo was informed by the Director of HEW's Office for Civil Rights for Region V that, in view of Romeo's unwillingness to voluntarily comply with the regulations in question, the matter had been turned over to HEW's Washington Office for Civil Rights, with a recommendation to initiate enforcement proceedings. On November 12, 1976, the Director of the Washington Office informed Romeo that the matter was being referred to HEW's Office of General Counsel for the initiation of enforcement proceedings. On November 15, 1976, enforcement proceedings were commenced with the filing of an administrative complaint. On December 12, 1976, the Office of Civil Rights directed that final approval on any applications by Romeo for increased aid to current programs or for aid to new programs be deferred pending the outcome of enforcement proceedings.

At a hearing before this court on February 8, 1977, plaintiff made an oral motion for a preliminary injunction to restrain further administrative action by HEW prior to the disposition of its motion for summary judgment. The initial administrative prehearing conference in this matter was scheduled for the following day, February 9, 1977. This court contacted the presiding Administrative Law Judge, the Honorable Allen E. Gramza, on February 9 and secured his agreement to postpone further administrative action for 45 days, pending the issuance of this opinion.

are clearly focused. *Aircraft and Diesel Equip. Corp. v. Hirsh,* 331 U.S. 752, 767–768, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947).

HEW further contends that this court would not have jurisdiction over plaintiff's suit even after a final decision to cut off Romeo's federal financial assistance under Title IX. According to defendant, plaintiff is already entitled under § 1683 to review by the United States Court of Appeals for the Sixth Circuit of any final action by HEW terminating financial aid.[7] Defendant contends that this explicit statutorily-created review procedure is exclusive and precludes this court from entertaining plaintiff's action under the Administrative Procedures Act at any time. *DuBois v. Clark, supra; Lance Roofing Co. v. Hodgson,* 343 F.Supp. 685 (N.D.Ga.1972).

■ These contentions are not persuasive. Section 1682 authorizes HEW to promulgate "rules, regulations, or orders of general applicability" to effectuate the purposes of Title IX. "Agency action," for the purposes of the Administrative Procedures Act, expressly includes "the whole or a part of an agency rule," and "rule" is separately defined by the Act as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). The regulations here in question have the force of law; they are in final, approved form and currently in full effect. Their promulgation is therefore "final agency action" reviewable under the A.P.A.

■ The validity of federal agency regulations may, under certain circumstances, be judicially tested prior to their enforcement. *Abbott Laboratories v. Gardner,* 387

U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) forcefully upholds pre-enforcement actions of this nature. In that case, the Commissioner of Food and Drugs had issued regulations under the 1962 Amendments to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.,* requiring that all labels and advertisements for prescription drugs carry both the drug's proprietary name and its "established" name, as designated by the Secretary of HEW. A group of drug manufacturers brought suit to have these regulations declared invalid prior to the effective date of their enactment on the ground that the Commissioner had exceeded his statutory authority in promulgating them. The Supreme Court held that a district court could properly entertain such pre-enforcement action under the Administrative Procedures Act and the Declaratory Judgment Act, 28 U.S.C. § 2201.

In reaching this decision, the Court stated that access to judicial review should only be restricted upon "clear and convincing evidence" that such was the legislative intent. *Abbott Laboratories v. Gardner, supra,* p. 141, 87 S.Ct. 1507 quoting *Rusk v. Cort,* 369 U.S. 367, 379–380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). The Court found that the special review provisions established under the Food, Drug, and Cosmetic Act did not preclude pre-enforcement review. In concluding that the controversy in *Abbott Laboratories* was ripe for judicial resolution, the Court cited and discussed several factors, including the "purely legal" nature of the issues involved and the direct, immediate and adverse impact of the regulations upon petitioners, who would have been automatically liable for both civil and criminal penalties for non-compliance once the regulations became effective. It noted the significant

---

7. 20 U.S.C. § 1683 states in pertinent part:

Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.

Section 1683 thus incorporates any judicial review provisions otherwise established by Congress for reviewing decisions of HEW terminating federal aid to education. Specifically, Title

I and II of the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 241, *et seq.,* and 821, *et seq.,* through which Romeo receives the bulk of its federal assistance, permit review of aid termination decisions by the United States Court of Appeals for the circuit in which the affected school district is located. 20 U.S.C. §§ 241k, 827. It is defendant's position that this right of review is available to plaintiff under the incorporating language of § 1683.

burden which compliance would have imposed on petitioners' business operations as a further consideration which militated for pre-enforcement review, and the lack of any evidence to show that the suit was brought for the purpose of delaying or impeding administrative enforcement of the regulations in question.

All of these factors are present in this case. HEW has already acted under the disputed regulations to postpone any final approval of applications by Romeo for funding of new programs or for significant increases in the funding of existing programs. Though the amount of this financial assistance may be relatively small, the court credits the affidavit of Robert Reid, Superintendent of Romeo Community Schools, in which he states that HEW's action has nevertheless adversely affected Romeo in its budgeting and planning responsibilities. *See Continental Air Lines, Inc. v. C. A. B.,* 173 U.S.App.D.C. 1, 522 F.2d 107, 126 (1975); *Textile and Apparel Group, Am. Imp. Assoc. v. F. T. C.,* 133 U.S.App.D.C. 353, 410 F.2d 1052, 1054, *cert. denied,* 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185 (1969). Plaintiff also contends that defendant's steps toward regulatory enforcement have undermined public confidence in plaintiff, and this may well be so. *See A. O. Smith Corp. v. F. T. C.,* 530 F.2d 515, 524 (3rd Cir. 1976). Thus, while the regulations here in question do not carry the kind of automatic civil and criminal penalties involved in *Abbott Laboratories,* their impact upon plaintiff has nevertheless been made direct, immediate, and adverse by defendant's pre-enforcement conduct.

In order to comply with the disputed regulations, Romeo would be forced to modify the existing collective bargaining agreement between Romeo and its teacher employees, and a new policy regarding pregnancy and maternity leave would have to be implemented. All employees who are not allowed to use accrued sick leave time for pregnancy-related leave since June of 1972 would have to be reimbursed for salary and schedule increments lost as a result of Romeo's existing policies, and salary and retirement credits of these employees would have to be adjusted as well. Clearly, compliance with HEW's regulations would require an immediate and significant change in the conduct of plaintiff's affairs. *Abbott Laboratories v. Gardner, supra,* 387 U.S. p. 152, 87 S.Ct. 1507; *A. O. Smith Corp. v. F. T. C., supra.*

It is not apparent how defendant's administrative enforcement proceedings could materially advance the resolution of this dispute. The only issue raised by plaintiff's complaint is defendant's authority under Title IX to promulgate the regulations contained in Subpart E of 45 C.F.R. § 86.1, *et seq.* Romeo freely concedes non-compliance with these regulations, and the evidence supporting this concession seems clear enough. Under these circumstances, there does not appear to be any factual issue for which an extensive administrative record need be compiled. *Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); *Troy v. Shell Oil Co.,* 378 F.Supp. 1042, 1044–1045 (E.D.Mich.1974). Romeo's challenge to HEW's authority in this case is purely legal.

Nor are any administrative remedies foreclosed by Romeo's refusal to preliminarily exhaust compliance proceedings. As noted, plaintiff's complaint raises the legal issue of HEW's statutory authority to issue the regulations in question; enforcement proceedings, however, are concerned primarily, if not solely, with the factual issue of compliance. Moreover, there is no question that HEW fully regards the disputed regulations as valid; HEW would not be enforcing them if it did not. HEW cannot claim primary jurisdiction over a legal dispute for which it can provide no meaningful forum. *Seepe v. Dept. of Navy,* 518 F.2d 760, 762 (6th Cir. 1975); *Weinberger v. Salfi, supra,* 422 U.S. 764–765, 95 S.Ct. 2457; *F. T. C. v. Markin,* 532 F.2d 541 (6th Cir. 1976); *Columbia Broadcasting System v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Jewel Companies, Inc. v. F. T. C.,* 432 F.2d 1155, 1159 (7th Cir. 1970).

This controversy is ripe for judicial resolution, and plaintiff, under the circumstances, need not await review by the United States Court of Appeals. Even if the Court of Appeals has jurisdiction under the reviewing statutes cited by defendant to adjudicate the issues raised in this case, such jurisdiction would not be exclusive. Here, as in *Abbott Laboratories,* the legislative scheme explicitly contemplates a cause of action under the A.P.A. for redress of unlawful agency action "not otherwise subject to judicial review." 20 U.S.C. § 1683.[8]

Plaintiff has made out a valid case for pre-enforcement relief, and defendant's motion to dismiss must accordingly be denied. There is nothing to be gained by requiring plaintiff to exhaust administrative remedies which do not exist or to await uncertain future opportunities for legal redress before the Court of Appeals. If these regulations are invalid, plaintiff is entitled to know that now.

### III.

The issue of HEW's authority to promulgate regulations governing employment relations under Title IX is essentially one of statutory construction. Title IX was patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C §§ 2000d—d–5, which prohibits race discrimination in all federally funded programs. Most of the provisions of Title IX are virtual carbon copies of parallel provisions in Title VI; indeed, Title IX was originally contemplated as a simple amendment to Title VI adding sex discrimination in federally assisted education programs to the general prohibitory language

of § 2000d.[9] Both Title IX and Title VI contain similar provisions regarding investigation and enforcement, the imposition of sanctions, the promulgation of regulations by HEW, and judicial review.[10]

There is, however, one important difference between these two statutes: Title VI contains a provision specifically excluding discrimination in employment from its coverage:

§ 2000d–3

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

Title IX contains no parallel provision.

This fact, in defendant's view, is clear proof that Congress did not mean to limit the scope of Title IX to exclude coverage of sex discrimination in employment. Defendant argues that a "commonsense" reading of § 1681, standing alone, shows that teachers fall within the class of individuals protected by this provision, since the statute provides that "no person" shall be subjected to discrimination, and the term "person" includes both students and teachers.[11] Thus, HEW construes its legislative mandate as authorizing direct regulation of sex discrimination in employment by federally funded schools; it is HEW's position that such discrimination is itself grounds for terminating a school's federal aid, without regard to whether students are affected by the school's employment policies.

---

8. Section 1683 provides in pertinent part:
   In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that Title.

9. H.R. 16098, § 805(a), 91st Cong., 1st Sess. (1969). It appears that the original drafts of Title IX were "marked up" xeroxed copies of Title VI. See *Minutes of the House Committee of Education and Labor,* (Sept. 30, 1971).

10. Compare *20 U.S.C §§ 1681, 1682,* and *1683* with *42 U.S.C. §§ 2000d, 2000d–1,* and *2000d–2.*

11. Brief in Support of Defendant's Motion to Dismiss, or, In the Alternative, For Summary Judgment, p. 15.

Defendant also relies on the legislative history of Title IX to show a congressional intent to regulate employment practices under § 1681. Senator Birch Bayh, the Senate sponsor of Title IX, made these remarks during introduction of the bill:

Amendment 874 is broad, but basically it closes loopholes in existing legislation relating to general education programs and *employment* resulting from those programs. . . . More specifically, the heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds. The amendment would cover such crucial aspects as admission procedures, scholarships, and *faculty employment,* with limited exceptions.

[118 Cong.Rec. ¶ 2745 (daily ed., February 28, 1972) emphasis supplied]

Moreover, Congress reviewed the Title IX regulations in July, 1975, under 20 U.S.C. § 1232(d), and declined to disapprove them. From the hearings held regarding these regulations, it is clear that HEW's authority to regulate employment practices under Title IX was specifically discussed and considered. Again, Senator Bayh:

[T]he heart of these guidelines is the prohibition of the thwarting of equal opportunity for female students and teachers at any educational level.

These views were shared by Representative Patsy Mink:

[T]he legislative history of Title IX indicates that employment was indeed covered by the broad mandate of the law for nondiscrimination on the basis of sex. The original House bill included an exemption for employment patterned after the exemption in Title VI of the Civil Rights Act. The Senate version contained no such exemption, indicating that employment was covered. In conference, the language of the Senate version was adopted.

Hearings, *supra,* p. 164.

The Secretary further argues that his own interpretation of Title IX's scope is entitled to great weight as an official and contemporaneous interpretation by the enforcing agency. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Lau v. Nichols,* 414 U.S. 563, 571, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

The absence of an explicit provision in Title IX, similar to § 604 of Title VI, 42 U.S.C. § 2000d–3, excluding employment discrimination from its coverage does not show a congressional intent to make Title IX broader than Title VI in this respect. Rather, this discrepancy must be traced to the fact that Title IX was enacted as part of a larger legislative program which also included an amendment to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* enlarging the scope of *that* provision to include sex discrimination in employment, as well as an amendment to the Equal Pay Act, giving the Secretary of Labor authority to regulate sex discrimination in educational employee compensation. 29 U.S.C. § 206(d).[12] A provision similar to § 604 was left out of this package in order to avoid the inherent contradiction between such a provision and these amendments.

HEW's arguments based on the legislative history of Title IX are not compelling. Senator Bayh's quoted assertion of employment discrimination coverage by Title IX in his remarks during introduction of this bill was made in reference to the entire Title IX legislative package, including the Title VII and Equal Pay Act amendments. The legislative history of the regulations themselves is entitled to little if any weight in determining the scope of § 1681. These regulations were reviewed some three years after the enactment of Title IX and by a different Congress. Nor is the congressional failure to disapprove the regulations any indication of their validity. 20 U.S.C. § 1232 expressly provides that the failure of

---

12. The provision of Title IX which amended Title VII passed both Houses of Congress and the conference committee, but was deleted pri- or to enrollment as public law, due to the fact that a similar amendment had already been enacted as part of another bill.

Congress to disapprove regulations promulgated by HEW is not evidence of approval and creates no presumption of validity.[13]

Plaintiff has mustered its ·own presentation of Title IX's legislative history to support an alternative construction of its coverage. Plaintiff points out that § 601 of Title VI, 42 U.S.C. § 2000d, upon which § 1681 of Title IX is based, was never ·considered by Congress as covering race discrimination in employment, even standing by itself. The exclusionary language of § 604, 42 U.S.C. § 2000d–3, which finds no counterpart in Title IX, was only included in Title VI as an afterthought, to make this point clear and to resolve any ambiguity in the language of § 601.[14] Plaintiff also notes that Title IX contained a provision identical to § 604, denominated § 904, throughout its passage. It was only in committee conference just prior to final ·passage, that the provision was deleted.[15] This indicates, in plaintiff's view, that Congress considered § 904 a needless restatement of § 901's limited coverage.

Plaintiff also notes that during the hearings held on Title IX before the House Special Subcommittee on Education, not one witness who testified about Title IX's employment discrimination coverage did so with reference to § 901. Rather, all such testimony was directed toward those provisions of Title IX which amended Title VII and the Equal Pay Act to include employment discrimination in education within their purview.[16] The court, however, will not pursue plaintiff's analysis of the legislative history of this Act further, for there is a much more obvious and relevant source for determining the scope of Title IX and that is Title IX itself.

## IV.

■ The court's analysis begins with the prohibitory language of § 1681:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance . . . .

Though cast in broad terms, § 1681 nevertheless addresses itself only to sex discrimination against the participants in and the beneficiaries of federally assisted education programs. Section 1681 must therefore be read to protect from sex discrimination only those persons for whom the federally assisted education programs are established, and this can only mean the school children in those programs. As a reference to faculty employees, the language of § 1681 is indirect, if not obscure. Teachers participate in these programs only to the extent that they may teach and help administer some of them; teachers benefit from these programs only to the extent that the funds for them may be used to pay their salaries; teachers are "subjected to discrimination under" these programs, (emphasis added),

13. 20 U.S.C. § 1232(d)(1) provides in part:

Failure of the Congress to adopt such a concurrent resolution with respect to any such final regulation prescribed under any such Act, shall not represent, with respect to such final regulation, an approval or finding of consistency with the Act from which it derives its authority for any purpose, nor shall such failure to adopt a concurrent resolution be construed as evidence of an approval or finding of consistency necessary to establish a prima facie case, or an inference or presumption, in any judicial proceeding.

14. Senator Humphrey, the floor leader of Title VI, stated in reference to § 604 that the provision merely "made a number of points clearer and more specific. We have expressed in specific legislative language what has always been intended." 110 Cong.Rec. 12707 (1964).

15. The report of the committee conference is cryptic in its reference to this deletion:

(f) In addition, the House amendment, but not the Senate amendment, provided that nothing in the title authorizes action by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment. The House recedes.

1972 U.S.Code Cong. & Admin.News, Vol. 2, pp. 2671–2672.

16. *Hearings on Section 805 of H.R. 16098 Before the Special Subcommittee on·Education on the House Committee on Education and Labor*, 91st Cong., 2nd Sess. (1970), 8–9, 27, 79, 128, 159, 304–306, 379.

only to the extent that the programs themselves may be established and operated in an employment-related discriminatory way. Teachers, in short, are hard pressed to fit themselves within the plain meaning of § 1681's prohibitory language, general as it may appear on its face. When Congress means to statutorily regulate employment discrimination, it uniformly does so in more explicit terms than this.[17]

HEW's "commonsense" interpretation of § 1681 notwithstanding, the court is constrained to read this language as a prohibition on sex discrimination against students and only students. The beneficiaries of Romeo's Title I remedial reading programs are the schoolchildren in those programs. The participants in Romeo's vocational education programs are the students learning new vocations through them. The beneficiaries of Romeo's School Lunch program are the disadvantaged children who receive free milk as a result of this federal assistance. Section 1681 was written in broad terms not to cover all forms of sex discrimination in education, but only to cover the wide variety of education programs funded by the federal government and the many ways in which sex discrimination against students in those programs can be manifested.

This construction of § 1681 is borne out by the series of coverage exclusions provided in § 1681 itself, all of which relate to student activity or enrollment. Thus, § 1681(a)(1) excludes coverage of admissions to vocational and higher educational institutions; (a)(2) excludes coverage of admission to educational institutions in the process of changing from a single-sex to a co-educational admissions policy; (a)(4) excludes coverage of military academies; (a)(5) excludes coverage of admissions to educational institutions which have traditionally admitted members of only one sex; (a)(6)(A) excludes coverage of the membership practices of fraternities and sororities; (a)(6)(B) excludes coverage of the membership practices of the YMCA, YWCA, the Boy Scouts, Campfire Girls, and other youth service organizations which have tradition-

ally limited their membership to one sex. Not one of these exclusions concerns a federally assisted educational institution's employment practices, and this can be explained in only one of two ways: either Congress meant to allow wide-open coverage of employment practices under § 1681 while closely regulating § 1681 coverage in all other respects, or, and what appears more likely, Congress never meant to include employment practices within the coverage of § 1681 in the first place.

This construction of § 1681 is further supported by an analysis of § 1682, which defines HEW's enforcement power under the Act. As noted previously, the only sanction permitted under § 1682 is a termination of federal funds to the noncomplying institution. This aid termination provision, quite obviously, is of limited enforcement value. Imposition of this sanction will not necessarily compel a delinquent school system to modify or eliminate its discriminatory practices, but will necessarily penalize the students involved or enrolled in the affected programs. In a situation where the students themselves are the victims of sex discrimination, it is reasonable to assume that Congress balanced the costs and benefits involved and determined that any benefit which students might derive from the education programs financed by HEW was more than outweighed by the sex discrimination in those programs. A termination of federal aid under these circumstances has obvious justification.

However, in a situation where a federally assisted school system discriminates against its teacher employees, the § 1682 sanction has very limited justification. Termination of federal aid will have no more enforcement value in such a case, and the students participating in affected programs will still be the ones to suffer from the aid termination sanction, even though the sanction will not be imposed for the purpose of enforcing their rights. The court doubts that Congress would resort to such an arbitrary enforcement measure where alternative methods of prohibiting employment dis-

---

17.   See, for example, 42 U.S.C. § 2000e, et seq.; 29 U.S.C. § 206(d).

crimination, more effective and less costly than this, are readily available.

■ There is a further limitation on HEW's enforcement powers under § 1682 which is relevant here. HEW's authority to terminate federal funds for non-compliance with § 1682 is "limited in its effect to the particular program, or part thereof, in which such non-compliance has been found." This limiting language makes the sanction provided by § 1682 "program specific." HEW is prohibited from terminating financial assistance to some programs in a school's curriculum simply because other programs are not in compliance with § 1681. Thus, HEW must determine the appropriateness of aid termination under § 1682 on a program-by-program basis.

This limitation on HEW's enforcement power is implicitly a limitation on HEW's authority to regulate as well. HEW cannot regulate the practices of an educational institution unless those practices result in sex discrimination against the beneficiaries of some federally assisted education program operated by the institution. The focus of § 1681—elimination of sex discrimination in federally funded education programs—must be the focus of HEW's regulations under § 1682 as well. To this extent, HEW's regulatory power is also "program specific."

Regulation of employment practices, however, is inherently non-"program specific." An educational institution's employment policies are general in nature, covering, by and large, all faculty employees involved in all of an institution's education programs, whether federally funded or not. Regulation of those policies by HEW will therefore necessarily entail the regulation of employment practices unrelated to the particular programs funded by the federal government and without regard to whether such practices result in sex discrimination against the beneficiaries of those programs. Compliance with HEW's regulations under Subpart E will inevitably require modifications of employment policies which apply generally to all faculty employees and education programs throughout the system. Yet the federal interest involved here, as defined by the scope of §§ 1681 and 1682, is much narrower and does not appear to justify this kind of regulatory leverage. In Romeo's case, for example, only one out of every ten education programs receives federal financial assistance; less than 5% of Romeo's faculty employees are involved in any federally financed programs.

■ The necessarily comprehensive nature of HEW's employment regulations is borne out by the regulations here in dispute. Section 86.51 makes clear that Subpart E of Part 86, 45 C.F.R. § 86.51 *et seq.*, covers all employment practices in all programs of federally financed schools:

§ 86.51 Employment.

(a) General. (1) No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient which receives or benefits from Federal financial assistance.

(2) A recipient shall make all employment decisions in any education program or activity operated by such recipient in a nondiscriminatory manner and shall not limit, segregate, or classify applicants or employees in any way which could adversely affect any applicant's or employee's employment opportunities or status because of sex.

This coverage is patently overbroad. HEW could not enforce its regulations as to employment practices in Romeo's non-federally funded education programs except by terminating aid to those programs which are federally funded, and this would constitute a clear violation of the programmatically specific limitation on HEW's enforcement powers contained in § 1682.[18]

---

**18.** HEW contends that the term "program or activity" as used in § 1681 refers to the entire operation of the recipient educational institu-

tion. Brief in Support of Defendant's Motion to Dismiss or, In the Alternative, For Summary Judgment, p. 23. Hence, HEW argues that it

An even more persuasive indication that Congress did not intend to regulate employment practices under § 1681 is the fact that Congress specifically provided for such regulation under both Title VII and the Equal Pay Act elsewhere in the very same legislation. Under these amending provisions, both the EEOC and the Secretary of Labor are now empowered to investigate and bring suit to correct any alleged sex discrimination in educational employment. These governmental agencies, particularly the EEOC, were established specifically for the purpose of regulating discrimination in employment practices. These agencies have the expertise and their enabling legislation has provided them with the investigative and enforcement machinery necessary to compel compliance with regulations against sex discrimination in employment. HEW does not have similar enforcement authority. Even under HEW's own interpretation of its powers, a failure or refusal to comply with its regulation on employment discrimination can only be sanctioned with a termination of federal funds to the delinquent educational institution. While Congress does, as defendant points out, tend to widely delegate regulatory authority in the field of civil rights, it is difficult to believe that Congress felt any real need under Title IX to delegate to HEW such marginal regulatory authority as an addition to that already clearly and adequately established in two other federal regulatory agencies.

■ For all of these reasons, the court holds that HEW's regulations purporting to govern employment discrimination in federally funded educational institutions are not in furtherance of the legislative purpose of § 1681, and are therefore not authorized by § 1682. In view of the legislative history of the Act, the specific prohibitory language of § 1681 itself, the series of exclusions to its coverage all of which relate to non-employment practices, the limitation of § 1682's enforcement sanctions to a termi-

nation of federal financial aid, the further limitation of this termination power to the particular federally financed programs affected, and the provision in other parts of the same legislative package for regulation of sex discrimination in employment by both the EEOC and the Department of Labor, the court is persuaded that § 1681 must be interpreted as a prohibition only on sex discrimination by federally funded educational institutions against their students.

## V.

Finally, defendant raises an "infection" theory, by which it claims the authority under Title IX to regulate sex discrimination against teachers to. the extent that such discrimination may "infect" a school system's federally funded education programs and so constitute sex discrimination against students in those programs. This argument finds its source in a discussion, largely dicta, by the United States Court of Appeals for the Fifth Circuit in the case of *Bd. of Education of Taylor Co. v. Finch*, 414 F.2d 1068 (5th Cir. 1969). *Taylor Co.* was actually a Title VI case involving a decision by HEW to terminate federal aid to all of plaintiff's education programs due to a determination of non-compliance with Title VI in some of them. The Court of Appeals for the Fifth Circuit ruled this agency action illegal, holding that Title VI's program-specific aid termination sanction prevents HEW from condemning programs by association. The court then discussed potential situations in which discrimination in one education program could provide a basis for terminating aid in another, or in which some form of systemic, non-programmatic discrimination could infect a particular federally funded education program and render it discriminatory in effect or operation:

We note finally that the purpose of the Title VI cutoff is best effectuated by separate consideration of the use or intended use of federal funds under each

---

may regulate employment practices through a school district's entire system. This novel and protean interpretation of a well-established statutory term was thoroughly refuted in *Board of Public Instruction of Taylor Co. v. Finch*, 414 F.2d 1068, 1077 (5th Cir. 1969).

grant statute. If the funds provided by the grant are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment, then termination of such funds is proper.

*Bd. of Education of Taylor Co. v. Finch,* *supra,* p. 1078.

HEW argues that this recognized potential for discrimination against students as a result of discrimination against their teachers provides sufficient justification for the regulation of employment practices under § 1681. HEW contends that where it can establish such a relationship between faculty discrimination and student discrimination in a federally funded education program, it is justified in enforcing the employment regulations in Subpart E as necessary.

There was a good deal of discussion at oral argument regarding this "infection" theory; it was treated extensively in the briefs. Whatever its validity or significance, however, the possibility of such a discriminatory infection does not authorize HEW to regulate employment practices for their own sake, and that quite clearly is what HEW purports to do through Subpart E of its Title IX regulations. There is no provision in any of these regulations which specifies that the particular employment practice regulated must result in substantial sex discrimination against students in federally financed education programs, nor does it appear that HEW considers itself under any obligation to establish such resultant student discrimination before the requirements of Subpart E may be enforced.[19]

This deficiency is fatal to defendant's "infection" argument, for the regulations must be judged as written. This court has neither the power nor the inclination to rewrite these regulations by construing their coverage of employment practices as reaching only situations where sex discrimination against students in affected programs has resulted. Defendant's Subpart E regulations are plainly focused on employment practices *per se.* To judicially engraft onto each of them an implicit requirement of infection would not merely provide a saving limitation on their coverage, it would substantially alter their meaning and effect.

Defendant's infection theory provides no basis in any event for legitimating its regulation of employment practices under Title IX. Even if HEW could establish, for example, that Romeo's pregnancy leave employment policies had infected one or more of Romeo's federally assisted programs so as to cause sex discrimination against students in those programs, HEW would still have no power to regulate Romeo's pregnancy leave policies directly. Section 1681 is concerned solely and simply with sex discrimination against students, and regulations promulgated in furtherance of § 1681 must have a similar focus. To allow HEW to use its authority under § 1682 to regulate employment practices under the guise of regulating sex discrimination against students would extend its authority beyond the clear purposes of § 1681. The marginal enforcement value of such a regulatory scheme and the obvious potential for bureaucratic overreaching persuade this court that HEW cannot directly regulate employment practices under Title IX even where resultant student discrimination is present. The legislative intention was plainly otherwise.

### VI.

Judgment will be entered declaring the regulations contained in Subpart E, 45 C.F.R. § 86.51, *et seq.* invalid and of no legal force and effect. An appropriate order may be submitted.

---

19. HEW has alleged "infection" at one point in its complaint against Romeo.