**BRUNSWICK SCHOOL BOARD,**
Plaintiff,

v.

Joseph A. **CALIFANO,** Jr., Secretary of Health, Education and Welfare, et al., Defendants.

**ISLESBORO SCHOOL COMMITTEE** et al., Plaintiffs,

v.

Joseph A. **CALIFANO,** Jr., Secretary of Health, Education and Welfare, et al., Defendants.

**Civ. Nos. 77–168 SD and 78–10 SD.**

United States District Court,
D. Maine, S. D.

April 13, 1978.

David P. Ray, Merton G. Henry, Nicholas S. Nadzo, Portland, Maine, for plaintiff in Civ. No. 77–168 SD.

Hugh G. E. MacMahon, Harry R. Pringle, Portland, Maine, for plaintiffs in Civ. No. 78–10 SD.

Waldemar G. Buschmann, Asst. Atty. Gen., Augusta, Maine, Barbara Allen Babcock, Asst. Atty. Gen., Barbara O'Malley, Brook Hedge, U. S. Dept. of Justice, Washington, D. C., for defendants in Civ. No. 77–168 SD.

George J. Mitchell, U. S. Atty., Portland, Maine, for defendants in Civ. Nos. 77–168 SD and 78–10 SD.

Donald F. Fontaine, Portland, Maine, Stephen J. Pollak, David Rubin, Washington, D. C., for amici curiae.

## OPINION AND ORDER

GIGNOUX, District Judge.

The two cases presently before the Court raise similar questions of law and have been consolidated for purposes of briefing and argument.

In Civil No. 77–168–SD, plaintiff Brunswick School Board seeks declaratory and injunctive relief against the Secretary of Health, Education and Welfare ("HEW"), the Maine Commissioner of Educational and Cultural Services and the State of Maine. In Civil No. 78–10–SD, plaintiffs Islesboro School Committee, Board of Directors of Maine School Administrative District No. 5, Board of Directors of Maine School Administrative District No. 33 and Winslow School Committee seek similar relief against HEW but have not joined as defendants the Maine Commissioner or the State of Maine. By leave of Court, the National Education Association, the Maine Teachers Association and the Brunswick Teachers Association have filed briefs and submitted oral argument, as amici curiae, in Civil No. 77–168–SD, supporting the position of the defendants.

Plaintiffs in both actions challenge the validity of an employment practices regulation, 45 C.F.R. § 86.57(c), promulgated by HEW pursuant to Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended 88 Stat. 1862 (1974), 90 Stat. 2234 (1976), 20 U.S.C. § 1681 *et seq.* ("Title IX").[1] The regulation in question requires the recipients of federal educational assistance funds to treat pregnancy equally with other temporary disabilities for all job related purposes. Currently before the Court are plaintiffs' motions for summary judgment and defendants' cross-motions to dismiss or, in the alternative, for summary judgment. The issues have been thoroughly briefed and fully argued.

The threshold question which the Court must decide is whether § 901 of Title IX, 20 U.S.C. § 1681, prohibits sex discrimination in employment by recipients of federal educational funds or is limited to a prohibition of sex discrimination against students and other direct beneficiaries of such federal aid. Because the Court is persuaded that the statutory language and the legislative history of § 901, as well as recent case law, establish that § 901 is so limited, and hence that HEW had no power to promulgate 45 C.F.R. § 86.57(c), the Court need not reach other issues raised by the parties.

### I.

The facts in each case are closely related and are without dispute. Plaintiffs are duly elected school boards charged with the responsibility for operating the public

---

1. Jurisdiction of the actions against HEW is asserted under 5 U.S.C. § 701 *et seq.*, and 28 U.S.C. §§ 1331, 1361, 2201 and 2202. Jurisdiction of the actions against the state defendants is predicated upon the doctrine of pendent jurisdiction.

schools within the municipalities or school administrative districts which they serve. All of the plaintiffs receive federal educational assistance funds and thus are subject to Title IX and to 45 C.F.R. § 86.57(c). During 1977 each of the plaintiff school boards was notified by the Office of Civil Rights, Region I, HEW, of a complaint received by HEW which alleged sex discrimination in the school board's maternity leave policy for teacher employees. Following an investigation of the complaint, HEW informed the school board in question that its teacher employment policy regarding maternity leave violates Title IX and 45 C.F.R. § 86.57(c) because pregnancy is treated differently from other temporary medical disabilities. HEW requested that the school board adopt a plan providing for appropriate corrective action. None of the school boards adopted such curative procedures or otherwise changed its employment practices. The Office of Civil Rights then notified each school board that it was referring the matter to the appropriate HEW office for enforcement action. The primary enforcement mechanism is termination of funding. In response to these developments, the various school boards instituted the present suits for declaratory and injunctive relief.

The Brunswick School Board action against the state defendants arises from a state statute, 20 M.R.S.A. § 3755, which requires the Commissioner to "insure" that federal or state funds distributed to school boards by the Maine Department of Educational and Cultural Services are spent "in compliance with" a number of federal and state laws, including Title IX and 45 C.F.R., Part 86.[2] Each school board which receives funds from the Department is required to complete an Assurance of Compliance form stating that the particular school board is

acting in compliance with the spending provisions set forth in § 3755. The Commissioner is empowered to withhold aid to a school board which fails to provide adequate assurance of compliance. 20 M.R.S.A. § 6.[3] To date Brunswick neither has returned a completed Assurance of Compliance form to the Department nor otherwise has assured the Department that its policies are in accord with the requirements of § 3755.

## II.

Section 901 of Title IX prohibits sex discrimination in federally funded education programs. It provides in pertinent part:

(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

Section 902 of Title IX, 20 U.S.C. § 1682, grants the appropriate federal department or agency the authority to promulgate rules and regulations to implement § 901. Section 902 additionally provides that compliance with such rules and regulations may be effected through termination of federal educational funding or by any other means authorized by law. Section 902 states in pertinent part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achieve-

---

**2.** 20 M.R.S.A. § 3755 provides in pertinent part:

The commissioner shall insure that any federal or state funds distributed to any school administrative unit are spent in compliance with:

.     .     .     .     .

2. *Education amendments.* Title 9 of the Education Amendments of 1972, 20 U.S.C.

§ 1681 et seq., and Part 86 of Title 45 of the Code of Federal Regulations . . . .

**3.** 20 M.R.S.A. § 6 provides in pertinent part:
1A. The commissioner is authorized to withhold state aid from an administrative unit in order to assure compliance with reporting requirements prescribed under this Title.

ment of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law

. . . .

Pursuant to § 902, HEW issued final regulations to implement Title IX, 45 C.F.R., Part 86, which became effective on July 21, 1975. Subpart E of these regulations, 45 C.F.R. §§ 86.51–86.61, regulates the conduct of Title IX schools toward their employees. 45 C.F.R. § 86.57(c), the regulation here challenged, states in pertinent part:

> (c) *Pregnancy as a temporary disability.* A recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy, and recovery therefrom and any temporary disability resulting therefrom as any other temporary disability for all job related purposes, including commencement, duration and extensions of leave, payment of disability income, accrual of seniority and any other benefit or service, and reinstatement, and under any fringe benefit offered to employees by virtue of employment.

4. It is possible, of course, for the protected class to consist of faculty members if the faculty are the ultimate beneficiaries of the federally aided activity, such as when the federal assistance furnishes support for faculty research. *See Seattle University v. United States Depart-*

## III.

### A.

■ The inquiry must begin with analysis of the language of the statute. Section 901 in terms addresses itself only to sex discrimination against the participants in and the beneficiaries of federally funded education programs. The clear, unconstrained import of the statutory language is that § 901 is designed to protect from sex discrimination those persons for whose benefit the federally assisted education programs are established, that is, the students in those programs.[4] The teacher employees of plaintiff school boards are not the direct beneficiaries of such programs and consequently do not fall within the plain meaning of the language of § 901.

■ Defendants argue that the mandate of § 901 that "no person" shall be the subject of sex-based discrimination necessarily forbids sex discrimination against teachers as well as against students, because both teachers and students fall within the term "person." This proposed interpretation, however, does violence to the specific wording of the statute and ignores the well established doctrine of statutory construction of *ejusdem generis* : where a general term is followed by specific words in an enumeration describing a legal subject, the general term is construed to embrace only persons or objects similar in nature to those described by the specific words. *See* 2A Sutherland, *Statutes and Statutory Construction* § 47.14 (4th ed., C. Sands 1973). Here, the specific words of § 901 unmistakably delineate the direct beneficiaries of or participants in federally aided education programs as those whom the statute seeks to protect. The more general words contained in the statute must be construed as comprehending only persons similar to this specifically described class of individuals.

*ment of Health, Education and Welfare*, No. C77–6315 (W.D.Wash. January 3, 1978), slip op. at 5. In the cases at bar, however, the teachers are not the direct beneficiaries of federal educational funding and defendants do not so contend.

■ The foregoing reading of § 901 is reinforced by examination of the list of coverage exclusions set forth in § 901 itself, all of which relate to student activities or enrollment policies. Section 901(a)(1)–(9), 20 U.S.C. § 1681(a)(1)–(9). Thus, for example, § 901(a)(1) excludes coverage of admissions to vocational and higher educational institutions; § 901(a)(2) excludes coverage of admissions to educational institutions in the process of changing from a one-sex to a two-sex admissions policy; § 901(a)(5) excludes coverage of admissions to public institutions of undergraduate higher education which have traditionally admitted only students of one sex; § 901(a)(6)(A) excludes coverage of the membership practices of student fraternities and sororities; § 901(a)(6)(B) excludes coverage of the membership practices of the YMCA, the YWCA, the Girl Scouts, the Boy Scouts, the Camp Fire Girls, and other youth service organizations which have traditionally limited their membership to persons of one sex; § 901(a)(8) excludes coverage of father-son or mother-daughter activities. Not one of these statutory exclusions pertains to an educational institution's employment practices. It is highly unlikely that, if Congress had intended to include employment practices within the coverage of § 901, it would not have excluded from coverage faculty employment practices of educational institutions analogous to those institutions whose student admissions policies are presently exempted from coverage. Cf. 42 U.S.C. § 2000e–1. The failure of Congress to do so is persuasive indication that § 901 was not intended to regulate employment practices.

As the court in *Romeo Community Schools v. United States Department of Health, Education and Welfare*, 438 F.Supp. 1021 (E.D.Mich.1977), *appeal docketed*, No. 6–71438 (6th Cir. May 18, 1977), succinctly noted, any reference to faculty employees

in § 901 is "indirect, if not obscure. . . . When Congress means to statutorily regulate employment discrimination, it uniformly does so in more explicit terms than this." *Id.* at 1031, 1032 (footnote omitted). Defendants' construction of § 901 simply is not supported by the wording of the statute.

### B.

■ Although not without some ambiguity, the legislative history of Title IX supports the limited construction suggested by the language of § 901—that Congress did not intend in enacting § 901 to authorize HEW to regulate the employment practices of federally funded educational institutions. Title IX was patterned on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which forbids race discrimination in all federally funded programs, and most of the provisions of Title IX closely parallel the provisions of Title VI.[5] Thus, § 901 of Title IX is nearly identical to § 601 of Title VI, 42 U.S.C. § 2000d,[6] and § 902 of Title IX is a carbon copy of § 602 of Title VI, 42 U.S.C. § 2000d–1. The legislative history of Title IX demonstrates that Congress intended the Title IX language to have the same meaning as the similar Title VI language, and it is clear that § 601 of Title VI, upon which § 901 of Title IX is based, was not considered by Congress as covering race discrimination in employment. *See* Kuhn, *Title IX: Employment and Athletics are Outside HEW's Jurisdiction*, 65. Geo.L.J. 49, 50–54 (1976), and the legislative history of Title VI there cited.

There is, however, one major difference between Title VI and Title IX, which defendants emphasize. Title VI contains a section explicitly exempting discrimination in employment from its coverage. Section 604 of Title VI, 42 U.S.C. § 2000d–3 provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**5.** Indeed, the first House version of Title IX was a simple amendment to Title VI adding sex discrimination to the prohibition of race discrimination in Title VI. *See* H.R. 16098, 91st Cong., 2d Sess. (1970).

**6.** Section 601 of Title VI provides:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

Title IX contains no similar provision, and defendants argue that the absence of such a provision in Title IX is persuasive of the intent of Congress not to exclude sex discrimination in employment from the coverage of § 901. In further support of their position, defendants rely on the remarks of Senator Bayh made in 1972 during the congressional debates over the bill containing Title IX as showing a congressional intent to regulate employment practices under § 901. Senator Bayh, a sponsor of the bill, stated,

Amendment 874 [an amendment to the Education Amendments Bill of 1972 which, among other provisions, contained § 901] is broad, but basically it closes loopholes in existing legislation relating to general education programs and employment resulting from those programs. . . . More specifically, the heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds. The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment, with limited exceptions.

118 Cong.Rec. 5803 (daily ed. February 28, 1972). Defendants also point to Senator Bayh's synopsis of Title IX, which he included in the Congressional Record at the end of his remarks. *Id.* at 5807. Defendants argue that Senator Bayh's comments and similar observations made by him and Representative Patsy Mink three years later, at the time Congress reviewed the Title IX regulations here in issue,[7] demonstrate the broad reach which Congress intended § 901 to possess.

Defendants' arguments are not persuasive. The legislative background clearly shows that the failure of Congress to include in Title IX a provision similar to § 604 of Title VI, excluding employment discrimination from its coverage, does not indicate a congressional intent that the scope of § 901 be broader than that of § 601 in this respect. Title IX was a comprehensive legislative scheme which, in addition to § 901, also included both an amendment to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, extending the coverage of Title VII to previously exempted educational institutions, and an amendment to the Equal Pay Act of 1963, 29 U.S.C. § 206(d), expanding that Act to include within its purview employees of educational institutions. Title IX thus contained, in addition to § 901, provisions dealing directly and specifically with sex discrimination in educational employment.[8] A provision similar to § 604 of Title VI, excluding employment discrimination from the coverage of Title IX, surely would have contradicted these specific employment provisions in Title IX. Thus, although an earlier version of Title IX had, in fact, contained a provision identical to § 604, its deletion, because of the conflict it would have created with Title IX's employment provisions, cannot properly be interpreted as probative of a congressional intent to bring employment practices within the scope of § 901. *See* Kuhn, *supra* at 57–58.[9]

7. *See* Hearings before the Subcommittee on Secondary Education, Committee on Education and Labor, 94th Cong., 1st Sess., at 164, 171 (June 23, 1975).

8. The Title VII amendment eventually was deleted from the final version of the Education Amendments of 1972, because an identical amendment to Title VII had been included in the Equal Employment Opportunity Act of 1972, 86 Stat. 103, 42 U.S.C. § 2000e *et seq.*

(Supp. 4, 1974), which the President signed into law shortly before Congress passed the education bill. *See* Kuhn, *supra* at 60–61.

9. The Title IX provision corresponding to § 604 of Title VI was deleted in committee conference. The Conference Report does not discuss the reason for the deletion. *See* Conference Report No. 798, 92d Cong., 2d Sess., 1972 U.S. Code Cong. & Admin.News, pp. 2608, 2671–72.

Nor do Senator Bayh's remarks support defendants' position. Amendment 874, to which Senator Bayh referred, was the original draft of Title IX, which included both § 901 and the Title VII and Equal Pay Act amendments. It is apparent that his remarks, as well as his synopsis of Title IX, insofar as they pertained to employment discrimination, can only reasonably be understood as alluding to the Title VII and Equal Pay Act amendments, and not to § 901.

Defendants also attempt to make much of the fact that Congress did not disapprove the regulation here at issue when it had the opportunity to do so prior to the final promulgation of the Title IX regulations in 1975. Defendants interpret this congressional action, or lack thereof, as demonstrative of congressional sentiment that the regulation accurately reflects the meaning of § 901. Congress, however, by statute has expressly stated that the failure of Congress to adopt a resolution disapproving of HEW regulations issued in conjunction with any federal legislation dealing with education should not have such an effect. 20 U.S.C. § 1232(d)(1), an amendment to the General Education Provisions Act, provides in part:

> Failure of the Congress to adopt such a concurrent resolution with respect to any such final regulation prescribed under any such Act, shall not represent . . an approval or finding of consistency with the Act from which it derives its authority for any purpose, nor shall such failure to adopt a concurrent resolution be construed as evidence of an approval or finding of consistency necessary to establish a prima facie case, or an inference or presumption, in any judicial proceeding.

In sum, the legislative history of Title IX, like the text of § 901, demonstrates that § 901 is not directed at sex discrimination in employment. It is apparent that in enacting Title IX Congress had two principal purposes: (1) the protection of students against sex discrimination in federally assisted education programs, with enforcement by HEW, as provided in §§ 901 and 902; and (2) the protection of employees in educational institutions against sex discrimination, with enforcement by the Equal Employment Opportunity Commission and the Department of Labor, as provided in the Title VII and Equal Pay Act amendments.

C.

The two federal courts which have directly addressed the question have both concluded that § 901 only reaches sex discrimination among the beneficiaries of federally aided education programs and does not cover discriminatory employment practices. *Romeo Community Schools v. Department of Health, Education and Welfare, supra; Seattle University v. Department of Health, Education and Welfare, supra.* The *Seattle University* litigation stemmed from a charge that the University had discriminated on the basis of sex in the award of faculty salaries. *Romeo Community Schools* dealt specifically with pregnancy disability benefits and the authority of HEW to promulgate 45 C.F.R. § 86.57(c). The court in *Seattle University* entered a declaratory judgment that the Title IX employment regulations, 45 C.F.R., Subpart E, §§ 86.51–86.61, were void and of no effect because they exceeded the authority delegated to HEW under Title IX. The court granted appropriate injunctive relief. The final judgment entered in *Romeo Community Schools* was comparable to that in *Seattle University,* but was restricted to a declaration that 45 C.F.R. § 86.57(c) was invalid, since the court determined that the plaintiff school district possessed standing only to challenge that section. *See* order of Feikens, J., so modifying the reported opinion, Civil Action No. 6–71438 (E.D.Mich. May 18, 1977). The arguments raised and considered in *Seattle University* and *Romeo Community Schools* were similar or identical to those presented in the instant cases. In each case the court reviewed the statutory language and legislative history of § 901

and concluded that § 901 prohibits only sex discrimination by federally funded educational institutions against their students and does not cover the employment practices of such institutions.

Defendants place considerable reliance upon *Piascik v. Cleveland Museum of Art,* 426 F.Supp. 779 (W.D.Ohio 1970), in which the court found an implied private right of action for sex-based employment discrimination under § 901. *Id.* at 780–81 n.1. The *Piascik* court, however, held that the plaintiff, a woman who had applied for and had been denied a position as a security guard with defendant, had not been denied employment because of her sex. A reading of *Piascik* reveals that questions concerning the scope of § 901 were not the focus of the action, the applicability of § 901 to the alleged discrimination apparently was not contested, and to the extent that the court addressed the issue presented by the instant cases, it was disposed of in only a brief, conclusory manner. *Idem.*[10]

Defendants also rely on *United States v. City of Chicago,* 395 F.Supp. 329 (N.D.Ill.), aff'd, 525 F.2d 695 (7th Cir. 1975). *City of Chicago* held that § 122(a) of the State and Local Financial Assistance Act of 1972, 31 U.S.C. § 1242(a) (the Revenue Sharing Act), the language of which closely resembles § 901 of Title IX, barred employment discrimination by recipients of federal revenue sharing funds. *City of Chicago,* however, is distinguishable, since both the statutory context and legislative history of § 122(a) differ from that of § 901. Unlike § 901, § 122(a) does not include an extensive list of exclusions from its coverage which shed light on its meaning. Nor was § 122(a) enacted as part of a comprehensive remedial legislative package which also included provisions specifically addressing employment discrimination.

■ Scant as it may be, the case law thus leads to the same conclusion as do the textual analysis and the legislative history of § 901: the statute does not cover the employment practices of educational institutions receiving federal funds, but rather is restricted in scope to a prohibition of sex discrimination against students and other direct beneficiaries of such federal assistance.

### D.

As an alternative argument, defendants contend that § 901 reaches employment discrimination in those situations where employment discrimination has an adverse effect on students or other beneficiaries of federal funding. Employment discrimination under these circumstances is said to "infect" the students. Defendants derive this position from cases which have held that Title VI of the Civil Rights Act of 1964 reaches racial discrimination in employment when such discrimination results in discrimination against students. *See, e.g., Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068, 1078 (5th Cir. 1969); *United States v. Jefferson County Board of Education,* 372 F.2d 836, 893 (5th Cir. 1966), aff'd en banc, 380 F.2d 385, cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

■ Defendants' reliance on this line of cases is misplaced. Defendants do not here claim that plaintiffs' pregnancy leave policies ultimately have a discriminatory effect on students. Moreover, no reasonable reading of 45 C.F.R. § 86.57(c) can limit its coverage to instances of discriminatory infection. Assuming *arguendo* the infection theory to be valid, the HEW regulation here challenged nevertheless is void because it comprises a general regulation of employment practices per se and is not limited to those situations in which employment dis-

---

**10.** The issue of whether Title IX implies a private cause of action for employment discrimination on the basis of sex likewise was raised in *McCarthy v. Burkholder,* 15 E.P.D. ¶ 7926 (D.Kan.1977), *modified on reconsideration,* 448 F.Supp. 41, (D.Kan. Feb. 2, 1978). The court originally had determined that Title IX implied such a private remedy but subsequently modified its order and dismissed plaintiff's Title IX claim in large part because of the intervening opinion in *Romeo Community Schools, supra. McCarthy, supra,* slip op. 4–6.

crimination results in discrimination against students or other program beneficiaries. *Romeo Community Schools v. Department of Health, Education and Welfare, supra* at 1035; *Seattle University v. Department of Health, Education and Welfare, supra,* slip op. at 9–10.

## IV.

In addition to the contentions advanced by the federal defendants in support of their challenge to 45 C.F.R. § 86.57(c), the state defendants submit two arguments peculiar to Brunswick's suit against them.

First, the state defendants insist that, with respect to them, Brunswick's claim is not yet ripe for adjudication, because no formal finding has been made that Brunswick is in violation of 20 M.R.S.A. § 3755, and because no state enforcement procedures have been commenced against Brunswick. The Court finds this argument unpersuasive.

The basic test for determining ripeness involves an examination of whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" to warrant a judicial decision. *Lake Carriers Association v. MacMullen,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972); *see Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–56, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). Applying this test, the propriety of judicial resolution of the question here presented is manifest. The facts are undisputed; the matter before the Court is of a strictly legal nature. HEW already has concluded that Brunswick's pregnancy leave policy treats pregnancy differently from other temporary medical disabilities. Brunswick's policy clearly runs contrary to 45 C.F.R. § 86.57(c), and Brunswick so far has refused to assure the Commissioner that it will revise its employment practices to comport with the requirements of the regulation. Brunswick's interest in not having to comply with 45 C.F.R. § 86.-57(c) is substantially adverse to that of the state defendants, whose mandate under 20 M.R.S.A. § 3755 is to insure that Brunswick and similarly situated school boards are acting in accord with the regulation. The fact that the State has not instituted enforcement action does not detract from the immediacy and reality of the controversy between the parties. If to qualify for the federal and state aid distributed by the Department of Educational and Cultural Services Brunswick needs to satisfy the terms of 45 C.F.R. § 86.57(c), it is evident that Brunswick will be required to effect prompt, far-reaching, and costly changes in its employment and fiscal policies. There exists a concrete controversy between the parties which is ripe for judicial determination.

The state defendants' second argument is equally without merit. It is that 20 M.R.S.A. § 3755 incorporates as the law of the State of Maine the regulations set forth in 45 C.F.R., Part 86 as they existed on the date the Maine statute became effective, regardless of their continued viability as federal regulations. This patently irrational construction of 20 M.R.S.A. § 3755 is not supported by the wording of the statute, nor have the state defendants introduced any legislative history or other authority which would indicate that the Maine Legislature intended the Commissioner to enforce an invalid federal regulation. The obvious purpose of § 3755 is to assure that state education policy reflects the public policy embodied in the applicable federal and state statutes and regulations. Were the state defendants' proposed interpretation of § 3755 to prevail, the statute quickly would become outmoded as the federal and state regulations cited therein underwent the customary process of change and modification. Section 3755 cannot reasonably be construed to incorporate those regulations contained in 45 C.F.R., Part 86 which have been superseded or amended or, which, as in

the present instance, have been found to be invalid and no longer to be given legal force and effect.

### V.

The Court holds that § 901 of Title IX is limited to a prohibition of sex discrimination against students and other direct beneficiaries of federal educational assistance funds and does not cover the employment practices of educational institutions receiving such funds. Accordingly, HEW had no power to promulgate 45 C.F.R. § 86.57(c).

\* \* \* \* \* \*

Plaintiffs' motions for summary judgment are granted; defendants' cross-motions for summary judgment or, in the alternative, to dismiss are denied; and judgment will be entered declaring 45 C.F.R. § 86.57(c) invalid and of no legal force and effect and enjoining defendants from commencing or maintaining any proceedings to withhold federal or state financial assistance from plaintiffs for noncompliance with 45 C.F.R. § 86.57(c).[11] Plaintiffs may submit proposed forms of judgment, with notice to defendants, within ten days. Defendants may present their comments thereon within five days thereafter.

IT IS SO ORDERED.

---

11. The propriety of granting injunctive relief is without question. Should defendants proceed with enforcement action, plaintiffs will suffer immediate and irreparable injury, including but not limited to the possible termination of their federal and state funding, the corresponding harm to the towns, citizens and students which they serve, loss of public confidence in the school systems they operate, and the inability to engage competently in long-term fiscal planning.