**HILLSDALE COLLEGE, Petitioner,**

v.

**DEPARTMENT OF HEALTH, EDUCA- TION AND WELFARE, et al., Respondents.**

**No. 80–3207.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1981.

Decided Dec. 16, 1982.

Betsy Levin, Gen. Counsel, Dept. of Educ., Washington, D.C., Karl M. Lehring, Kathleen Flake, Robert A. Derengoski, Sol. Gen., Lansing, Mich., Alice Daniel, Anthony J. Steinmeyer, Adrian L. Steel, Jr., Brian Landsberg, Dept. of Justice, Civ. Div., Appellate Section, Marie Klimesz (argued), Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, D.C., for respondent Dept. of Educ.

John M. Facciola, Gordon Coffman (argued), Wilkinson, Cragun & Barker, Washington, D.C., for Hillsdale College.

Roger W. Boer, Grand Rapids, Mich., for appellant.

Maxwell A. Miller, James G. Watt, Mountain States Legal Foundation, Denver, Colo., amicus curiae.

Before EDWARDS, Chief Judge, CECIL* and BROWN**, Senior Circuit Judges.

BAILEY BROWN, Senior Circuit Judge.

This appeal arises out of a compliance proceeding initiated against Hillsdale College by the General Counsel of the Department of Health, Education, and Welfare ("HEW")[1] in December, 1977, pursuant to the provisions of Section 902 of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1686 (1976) ("Title IX"), and the regulations promulgated thereunder.[2] HEW sought an order terminating the financial assistance Hillsdale College students receive through various federal student loan and grant programs because of Hillsdale's refusal to file HEW Form 639A ("Assurance of Compliance with Title IX Regulations") as required by 34 C.F.R. § 106.4 (1981).[3] Hillsdale's refusal to execute the Assurance of Compliance is the only basis for the HEW enforcement action; no allegations of actual sex discrimination on the part of the college have been made or are before this court. For the reasons stated herein, we hold that Hillsdale College is not required to execute the Assur-

---

* Judge Cecil concurred in this opinion prior to his death on November 26, 1982.

** Circuit Judge Brown retired from regular active service under the provisions of 28 U.S.C. § 371(b) on June 16, 1982, and became a Senior Circuit Judge.

1. HEW's functions under Title IX were transferred in 1979 to the Department of Education. See *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Both agencies shall hereinafter be referred to as HEW.

2. The regulations promulgated by HEW originally appeared at 45 C.F.R. Part 86, but were recodified in connection with the establishment of the Department of Education. 45 Fed.Reg. 30802 (1980). See note 1 *supra*. The regulations are now found at 34 C.F.R. Part 106 (1981).

3. 34 C.F.R. § 106.4 (1981) reads in pertinent part as follows:

(a) *General.* Every application for Federal financial assistance for any education program or activity shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Assistant Secretary, that each education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part.

ance of Compliance as a condition of its students' continued receipt of federal financial assistance and hereby reverse the Order issued below to that effect.

In an administrative proceeding before the HEW Civil Rights Reviewing Authority it was held that Hillsdale may be required to execute the Assurance of Compliance as a condition of its students' continued receipt of federal financial assistance. This appeal followed. 20 U.S.C. § 1683 (1976).

I. Introduction

Hillsdale College is a private, nonsectarian, coeducational college located in Hillsdale, Michigan with an enrollment of approximately 1,000 students. Since its founding in 1844, Hillsdale College has refused to accept any federal or state aid. Certain of its students, however, individually secure loans or grants to pay the costs of their education under four federal programs: the National Direct Student Loan ("NDSL") Program,[4] the Basic Educational Opportunity Grant ("BEOG") Program,[5] the

Supplementary Educational Opportunity ("SEOG") Program,[6] and the Guaranteed Student Loan ("GSL") Program.[7] In the year ending June 30, 1978, approximately one-fourth of Hillsdale's student body received aid under these loan and grant programs.

Title IX, enacted into law on June 23, 1972, is designed to prevent sex discrimination in federally assisted education programs and activities. Section 901(a) of Title IX provides as follows:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a) (1976). Section 902 of Title IX, which provides for the enforcement of Section 901, authorizes HEW to issue regulations to implement Section 901 and to enforce such regulations by administrative enforcement proceedings.[8] The ulti-

---

4. 20 U.S.C. §§ 1087aa–1087ff (1976). Under the NDSL Program, loans are made by Hillsdale to its students on the basis of need. The funds are used by the students to pay the costs of education, either by direct payment to Hillsdale (e.g., tuition) or to private vendors (e.g., books, rent for off-campus housing, etc.). In the year ending June 30, 1978, approximately 107 students at Hillsdale College secured approximately $104,000 in such loans. See Joint Stipulation of Facts, No. 4.

5. 20 U.S.C. § 1070a (1976). Under the BEOG Program, students secure grant funds directly from the United States to defray educational costs. In the year ending June 30, 1978, 54 Hillsdale students secured approximately $54,-000 in such grants. See Joint Stipulation of Facts, No. 5.

6. 20 U.S.C. §§ 1070b–1070b–3 (1976). Under the SEOG Program, funds allocated by HEW to Hillsdale are awarded by Hillsdale to needy students to defray educational expenses. In the year ending June 30, 1978, approximately 53 students attending Hillsdale College were awarded $37,400. See Joint Stipulation of Facts, No. 7.

7. 20 U.S.C. §§ 1071–1087–4 (1976). Under the GSL Program, students apply to private lending institutions for loans guaranteed in whole or in part by the United States. The funds are used to defray educational expenses. In the year

ending June 30, 1978, 51 Hillsdale students secured approximately $123,806 in GSL loans. See Joint Stipulation of Facts, No. 6.

8. Section 902 of Title IX, 20 U.S.C. § 1682 (1976), reads in part as follows:

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its

mate sanction for noncompliance is the termination of federal assistance to any program in which noncompliance is found. Section 903, 20 U.S.C. § 1683 (1976), provides for judicial review of any department or agency action taken pursuant to Section 902. These sections of Title IX were derived from the virtually identical language of Title VI of the Civil Rights Act of 1964, which prohibits race discrimination in federally assisted programs.[9]

On June 4, 1975, HEW issued final regulations to "effectuate Title IX of the Education Amendments of 1972...." 34 C.F.R. § 106.1 (1981). The portions of the regulations at issue in this case deal with the definitions of "recipient" and "federal financial assistance." Section 106.2(g)(1)(ii) defines "federal financial assistance" to include:

> Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

The term "recipient" is defined in the regulations to mean:

> [A]ny State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives *or benefits from* such assistance, including any subunit, successor, assignee, or transferee thereof.

effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law....

9.  42 U.S.C. § 2000d et seq. (1976). Sections 602 and 603 of Title VI are absolutely identical to sections 902 and 903 of Title IX; section 601 is almost identical except that it prohibits discrimination based on "race, color or national origin" whereas section 901 prohibits discrimination based on sex, and section 901 is limited to "any *education* program or activity" whereas section 601 covers "any program or activity" (emphasis added).

34 C.F.R. § 106.2(h) (1981) (emphasis added). An exception to this definition is found in 34 C.F.R. § 106.2(g)(5) (1981) which, in accordance with Section 902 of Title IX, exempts financial assistance in the form of contracts of insurance or guaranty from the enforcement authority of HEW.

The regulations, under Section 106.4(a), further provide that each "recipient" of "federal financial assistance," as defined above, must submit to HEW an "Assurance of Compliance" with Title IX, stating that each education program or activity operated by the institution to which the regulations apply will be conducted in compliance with Title IX and the regulations.[10]

Because Hillsdale College refused to execute such an Assurance of Compliance, HEW instituted these proceedings. Hillsdale's basic arguments as to why the order cutting off funds is invalid are as follows. First, it argues that, because it does not operate any "education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a) (1976), it is not a "recipient" of such assistance within the meaning of Title IX and therefore, contrary to the regulations, is not covered by Title IX at all. Stated slightly differently, Hillsdale contends that the receipt by its students of federal financial assistance does not make it, the institution, a "recipient" under Title IX. Second, Hillsdale argues that the federal loans and grants cannot be terminated because of its failure to sign an Assurance of Compliance with Title IX regulations since enforcement under Title IX is "program-specific" and it can be required to

10.  *See* note 3 *supra.* The Assurance of Compliance, HEW asserts, is critical to its effective enforcement of Title IX insofar as it provides a means of monitoring the threshold compliance with the statute by the large number of universities, colleges, schools, and other institutions covered by Title IX. A similar regulatory scheme is employed by the various agencies in charge of enforcing Title VI. *See, e.g.,* 38 C.F.R. § 18.4 (1981) (assurance of compliance required as a condition of receipt of federal financial assistance from the Veterans Administration).

assure compliance only as to programs actually receiving federal assistance. Implicit in this argument is the proposition that it is, at the most, subject to regulation under Title IX only as to its administration of the student loan and grant programs. While recognizing that under the Assurance the recipient agrees only to comply with the regulations to the extent applicable to it, Hillsdale points out that it is HEW's very theory that the entire institution is subject to such regulation.[11] Third, Hillsdale argues that termination of federal assistance, under the statute, cannot in any event be done unless there has been a showing of actual sex discrimination in the program receiving federal assistance.

### A. The ALJ Decision

The matter was referred to an Administrative Law Judge ("ALJ") upon a joint stipulation of facts and, on August 23, 1978, the ALJ issued his Initial Decision denying HEW's request for an order terminating federal financial assistance to Hillsdale's students.

The ALJ initially found that, under the definitions set forth in the regulations, the payments by HEW to the students under the NDSL, SEOG, and BEOG programs constituted federal financial assistance received by Hillsdale:

> The financial assistance helps students pay for their education at Hillsdale by defraying their costs of tuition, books, room and board and other expenses incurred in attending Hillsdale. Since funds are provided which Hillsdale would otherwise have to supply from its own resources, the total funds available to Hillsdale to carry on its education programs will also allow students to attend Hillsdale who would otherwise not have the financial means to do so, and so enlarge the population on which Hillside can draw for students.

This finding by the ALJ that Hillsdale was a recipient of federal financial assistance under the regulations and Title IX was held to be "persuasively supported" by the case of *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974), *aff'd without opinion,* 529 F.2d 514 (4th Cir.1975). *Bob Jones* arose under Title VI of the Civil Rights Act of 1964 and involved the payment of veterans' benefits to veterans attending Bob Jones University in Greenville, South Carolina. The University, which had a policy of denying admission to unmarried nonwhite students for religious reasons, refused to sign an Assurance of Compliance with Title VI. As a result, all VA assistance to the University was terminated.

The district court in *Bob Jones* upheld the termination, finding the veterans' benefits to be federal financial assistance "received" by the University. 396 F.Supp. at 601–602. In addition, the court held that the veterans' payments were "specifically tied to the beneficiary's participation in an educational program or activity," equating the statutory phrase "program or activity" with the entire institution. *Id.* at 602. Relying on such language, the ALJ found that, insofar as the federal grant and loan monies "received" by Hillsdale were not earmarked for specific programs but were utilized for general educational purposes, the institution *as a whole* was being financially supported through the payments made by the students under the federal programs. Consequently, the ALJ concluded, "it is the entire entity, Hillsdale College, which must vouch that each education program or activity operated by it will be operated in compliance with Title IX."

Although the ALJ found Hillsdale, as an institution, to be a recipient of federal financial assistance by virtue of the student aid programs, the College was not required by the ALJ to sign the Assurance of Compliance. The ALJ noted that the Assurance of Compliance imposed a contractual duty on Hillsdale to comply with Title IX and Title IX regulations. Because several courts, including this court, had held that

11. Hillsdale also contends that if Title IX is construed to apply to it to the extent urged by HEW, the statute would be unconstitutional.

In view of our disposition, we need not consider this contention. *Lynch v. Overholser,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1967).

the regulations found at 34 C.F.R. §§ 106.-51–106.61 (1981), relating to the prohibition of sex discrimination in employment, were invalid,[12] the ALJ held that under such circumstances, it would be an abuse of discretion and arbitrary and capricious to grant the relief requested by HEW.[13]

## B. The Reviewing Authority Decision

HEW and Hillsdale both filed exceptions to the ALJ's Initial Decision with the HEW Reviewing Authority, Civil Rights. On October 25, 1979 the Reviewing Authority denied Hillsdale's exceptions and granted HEW's exceptions in part, upholding the ruling of the ALJ that the Title IX regulations deeming Hillsdale to be a recipient of federal financial assistance are not in excess of the statutory authority granted HEW by Congress. The Reviewing Authority, however, rejected the ALJ's holding that Hillsdale cannot be required to sign the Assurance of Compliance in light of the fact that several courts had found part of the Title IX regulations to be invalid. By executing the Assurance of Compliance, the Reviewing Authority held, Hillsdale would bind itself to comply only with lawful regulations.[14]

## C. North Haven Bd. of Educ. v. Bell

The Supreme Court, subsequent to the decisions of the ALJ and the Reviewing Authority, held in *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 516, 102 S.Ct. 1912, 1915 n. 4, 72 L.Ed.2d 299, 305 n. 4 (1982), that the employment practices of educational institutions are subject to Title IX regulation provided the other statutory requirements are met.[15] *North Haven* thus removes the underlying basis for the ALJ's determination that Hillsdale cannot be required to execute the Assurance of Compliance, which was that signing the Assurance would compel the College to abide by the unlawful employment regulations.

In the course of upholding the validity of the employment regulations, however, the Court stressed the "program-specific" nature of Title IX, holding that "an agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitation of §§ 901 and 902." *Id.* 456 U.S. at 538, 102 S.Ct. at 1926, 72 L.Ed.2d at 317–318.[16] The Court, nevertheless, expressly declined to define the term "program." *Id.* 456

12. See *Seattle University v. HEW,* 621 F.2d 992 (9th Cir.1980), *vacated sub nom. United States Dept. of Educ. v. Seattle Univ.,* 456 U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982); *Dougherty Cty. School System v. Harris,* 622 F.2d 735 (5th Cir.1980), *vacated sub nom. Bell v. Dougherty Cty. School System,* 456 U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982); *Romeo Community Schools v. HEW,* 600 F.2d 581 (6th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Junior College Dist. v. Califano,* 597 F.2d 119 (8th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Isleboro School Comm. v. Califano,* 593 F.2d 424 (1st Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979). These decisions have been overturned by the Supreme Court in *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). See notes 15–16 *infra* and accompanying text.

13. In addition, the ALJ held that the GSL Program, insofar as it involves the guarantee of loans made by private financial institutions, falls within the Section 902 exemption for contracts of insurance or guaranty.

14. The Reviewing Authority also reversed the ALJ's determination that the GSL Program

does not constitute federal financial assistance. The Program, insofar as the interest payments thereunder are direct and immediate disbursements of federal funds aiding the college in the same manner as the funds disbursed under the NDSL Program, was held to go beyond the terms of the contract of insurance or guaranty exemption found in section 902.

15. The Court concluded, after an examination of the legislative and post-enactment history of Title IX, that Section 901(a)'s directive that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance," while not expressly referring to employees, does encompass employees as well as students of educational institutions. 456 U.S. at 519–538, 102 S.Ct. at 1917–1926, 72 L.Ed.2d at 307–318.

16. The Court held that the employment regulations were not inconsistent with Title IX's program-specific character because, although they spoke in general terms of the employment practices of educational institutions, they were limited by 34 C.F.R. § 106.1 (1981), which states that the purpose of the regulations is "to

U.S. at 540, 102 S.Ct. at 1927, 72 L.Ed.2d at 319.

## II. Issues on Appeal

As previously stated, Hillsdale College is presently before this court seeking review of the Order of the HEW Reviewing Authority requiring it to execute the Assurance of Compliance in order to remain eligible for federal financial assistance to its students. Under the facts presented, two major issues are before this court: (1) whether the regulations, by deeming Hillsdale College to be a "recipient" of federal financial assistance subject to Title IX by virtue of the receipt of its students of federal grants and loans, exceed the statutory authority granted HEW by Congress, and (2) whether HEW in any event can insist on the execution of the Assurance of Compliance as a condition precedent for the continuation of federal student assistance programs at Hillsdale College.[17] We determine that Hillsdale is a "recipient" within the meaning of Title IX but that the regulations are invalid to the extent that they purport to subject Hillsdale College as an institution to the strictures of Title IX. Specifically, we conclude that the regulations, as applied in this instance, contravene the program-specific nature of Title IX by equating the statutory phrase "education program and activity" with the educational institution itself. We reach this conclusion after examining the statutory language of Title IX, its legislative history, and the relevant case law.

## III. Statutory Language of Title IX

The two core provisions of Title IX, Sections 901 and 902, both contain express references to the program-specific focus of the statute. As noted by the Supreme Court in *North Haven,* Section 901 sets forth the statute's program-specific prohibition of gender discrimination, while Section 902 relates to enforcement, providing for termination of federal funds or denial of future grants as the ultimate sanction for noncompliance so long as the termination or refusal "is limited in its effect to the particular program, or part thereof, in which noncompliance has been so found...." 20 U.S.C. § 1682 (1976). See *North Haven,* 456 U.S. at 514, 102 S.Ct. at 1914, 72 L.Ed.2d at 304. The Court in *North Haven* relied on the existence of program-specific language in both the funding termination provision of Section 902 and the portion of Section 902 authorizing the issuance of implementing regulations[18] to reject the implicit view of the lower court that HEW's authority to issue regulations is broader than its enforcement authority, noting that "it makes little sense to interpret the statute ... to authorize an agency to promulgate rules it cannot enforce." *Id.* 456 U.S. at 537, 102 S.Ct. at 1926, 72 L.Ed.2d at 318.

Although stressing the requirement that Title IX regulations conform to the program-specific nature of the statute, the Supreme Court in *North Haven,* as previously stated, expressly declined to define the term "program." It is the position of HEW that, when an educational institution "receives" federal financial assistance by virtue of the receipt by its students of federal grants and loans, the *entire* educational institution constitutes a single "education program or activity." 20 U.S.C. § 1681(a) (1976). Specifically, HEW asserts that since "significant" portions of the loan and grant monies provided to the students at Hillsdale are used to pay tuition, which generally supports the College as a whole, the College itself is the relevant "education program and activity" receiving federal financial assistance and thus the *entire* Col-

---

effectuate title IX ... [,] which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education *program or activity* receiving Federal financial assistance ...." (emphasis added). *North Haven,* 456 U.S. at 535–540, 102 S.Ct. at 1926–1927, 72 L.Ed.2d at 318–319.

17. A third issue before this court is whether or not the GSL Program falls within the exemption found in Section 902 for contracts of insurance or guaranty. The holding of this case, however, makes it unnecessary to reach this issue.

18. See note 8 *supra.*

lege may be regulated under Title IX consistently with the statute's program-specific mandate.

An examination of the statutory language of Title IX does not bear out HEW's proposed expansive reading of the phrase "education program or activity." Initially, it should be pointed out that neither the term "educational institution" nor any equivalent term appears in Title IX's general prohibition, implementation, or enforcement provisions. Instead, in each instance, the phrase "education program or activity" is used. The term "educational institution" does however appear throughout the statutory exceptions to the general prohibition against sex discrimination set out in Section 901,[19] and is defined at Section 901(c) as follows:

> (c) For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

20 U.S.C. § 1681(c) (1976). In *Rice v. President and Fellows of Harvard College,* 663 F.2d 336 (1st Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982), the First Circuit held that "[t]he precision with which Congress defined educational institution strongly indicates that it did not equate education program with educational institution." 663 F.2d at 338. The appellant in *Rice,* a female law student at Harvard Law School, had brought suit under, *inter alia,* Title IX claiming sex discrimination in the awarding of grades at Harvard Law School. Because she had not specified any federally funded program in which she suffered discrimination on the basis of sex, the appellant argued that Harvard Law School should be deemed the relevant "education program" by virtue of its status as a recipient of federal funds for its work study program. No allegation of discrimination, however, was made concerning the School's handling of the work study program.

The court held that the appellant failed to bring herself within the protection of Title IX. Finding that Congress had "obviously recognized that an educational institution offers a number of education programs and activities," the court concluded that "the only meaningful interpretation of [20 U.S.C.] § 1681(a) is that it prohibits sex discrimination in a federally funded education program offered by an educational institution." 663 F.2d at 338.

IV. Legislative History

■ The First Circuit's conclusion in *Rice* that Congress, in passing Title IX, did not equate "education program" with "educational institution" is supported by an examination of the statute's legislative history. The legislative history of Title IX and Title VI, upon which Title IX is based,[20] supports the position taken by Hillsdale that Congress adopted a programmatic as opposed to an institutional approach to the problem of sex discrimination in education.

Title IX originated in a floor amendment to S. 659, 92d CONG., 1st SESS. (1971) (Education Amendments of 1971) sponsored by Senator Bayh. As originally introduced, Senator Bayh's amendment read as follows:

> No person in the United States shall, on the ground of sex, be excluded from participation in, be denied the benefits of or

---

**19.** The exceptions to the general prohibition against discrimination set forth at Section 901(a)(1–9), 20 U.S.C. § 1681(a)(1–9) (1976), include, *inter alia,* educational institutions of religious organizations with contrary religious tenets, educational institutions training individuals for military services or the merchant marine, public educational institutions with traditional and continuing admissions policies, fa-

ther-son or mother-daughter activities at educational institutions, scholarships awarded in "beauty" pageants by institutions of higher education, and, with regard to admissions, certain specified educational institutions and institutions commencing planned changes in admissions policies.

**20.** See note 9 *supra* and accompanying text.

be subject to discrimination under any program or activity conducted by a public institution of higher education, or any school or department of graduate education, which is a recipient of Federal financial assistance for any education program or activity....

117 CONG.REC. 30156 (1971). This amendment embodied an institutional approach as it would regulate *all* operations of an educational institution which received federal assistance for *any* of its programs or activities. The amendment, however, was ruled to be nongermane to the bill under consideration and defeated. 117 CONG.REC. 30415 (1971).

In February, 1972 the provision ultimately enacted as Title IX was introduced in the Senate by Senator Bayh during debate on the Education Amendments of 1972. 118 CONG.REC. 5803 (1972). The institutional approach of the original proposal was replaced by the program-specific language presently contained in Sections 901 and 902. No explanation or discussion was given for the change of approach.[21] The Senate adopted the amendment and, on June 8, 1972, Congress passed the provisions as Title IX of the Education Amendments of 1972. The measure was signed into law by the President on June 23, 1972.

The legislative history of Title IX is sparse. Because the statute is a result of a floor amendment, there are no committee reports discussing its provisions.[22] The Supreme Court in *North Haven,* however, found the shift in approach from the 1971 amendment to the 1972 amendment to be significant:

> Title IX's legislative history corroborates its general program-specificity. Congress failed to adopt proposals that would have prohibited *all* discriminatory practices of an institution that receives federal funds. See 117 Cong.Rec. 30155–30157, 30408 (1971) (Sen. Bayh's 1971 amendment) ....

*North Haven,* 456 U.S. at 537, 102 S.Ct. at 1926, 72 L.Ed.2d at 318 (emphasis in the original).

It thus appears clear that Title IX as enacted adopts the programmatic as opposed to institutional approach to discrimination on the basis of sex in education. This conclusion, however, is not dispositive of the issue of whether the regulations are inconsistent with the program-specific nature of Title IX to the extent they deem Hillsdale College to be a recipient of federal financial assistance by virtue of the federal aid provided its students. Although conceding that the effect of its assertion that

**21.** In *Haffer v. Temple University,* 524 F.Supp. 531 (E.D.Pa.1981), aff'd 688 F.2d 14 (3d Cir. 1981), the court cited the lack of explanation or discussion of the wording change between amendments in support of its view that the "history of the bill through enactment ... is ambiguous." *Id.* at 534.

**22.** The Supreme Court in *North Haven* noted that, because of the lack of committee reports discussing the provisions of Title IX, the remarks of Senator Bayh, as sponsor of the language ultimately enacted, are the "only authoritative indications of congressional intent regarding the scope of §§ 901 and 902." *North Haven,* 456 U.S. at 527, 102 S.Ct. at 1921, 72 L.Ed.2d at 311. Unfortunately, Senator Bayh did not specifically address the issue at hand during the course of the Congressional proceedings. The issue was presented to Senator Bayh, however, during the hearings held to determine if the proposed regulations "as they are written are consistent with the law, or whether they should be returned to [HEW] for redrafting until they are consistent with the law from which they must draw their authori-

ty." *Hearings on Title IX Before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor,* 94th CONG., 1ST SESS. 97 (1975) (remarks of Rep. O'Hara). Senator Bayh's remarks at the hearing are in pertinent part as follows:

> REP. QUIE: I am talking about whether the Department of Health, Education, and Welfare has overstepped its bounds in claiming that an institution is conducting a program or activity financed by the Federal Government if a student is receiving Federal aid to attend that program or those programs.
> SEN. BAYH: You know, I just don't know. I would have to look that up if you like; perhaps you know. That is not generally the kind of penalties that are meted out, as I am sure you realize.
> REP. QUIE: But I have heard it claimed that that is one of the reasons why they have jurisdiction.
> SEN. BAYH: I have not.

*Id.* at 181.

Hillsdale College itself is the relevant "education program or activity" is to subject the entire College to regulation, HEW contends that such a position is not institutional, since it does not attempt to regulate programs not receiving federal funds, as the original version of Title IX attempted, but instead is programmatic, with the entire College constituting the relevant "education program." Hence it is necessary to determine whether Congress intended entire educational institutions to be regulated under the phrase "education program or activity."

As previously noted, there is no explicit language in Title IX which supports HEW's position that an entire institution can constitute an "education program or activity." See *Rice v. President and Fellows of Harvard College, supra.* As noted by one commentator, the term "program" was used in the Congressional debates preceding passage of Title IX "to refer not to the total program of an educational institution but to smaller-scale activities within the institution." [23] In *Board of Public Instruction v. Finch,* 414 F.2d 1068 (5th Cir.1969), the Fifth Circuit similarly relied on the legislative history of Title VI to reject HEW's

assertion that the term "program" in Section 601 of Title VI, 42 U.S.C. § 2000d (1976), referred to general categories such as "school programs." The Court in *Finch* instead equated "program" with "federal grant statute," relying on the manner in which the term "program" was used during the debates on Title VI.[24]

In short, we find that the legislative histories of Title VI and Title IX reveal no indication that Congress contemplated that an entire educational institution could constitute a single "program or activity." We further find that the position asserted by HEW is inconsistent with the program-specific nature of Title IX insofar as its practical effect would be to circumvent the programmatic focus of the statute and adopt the institutional approach.

## V. Case Law

The inconsistency between equating "educational institution" with "education program or activity" and the program-specific nature of Title IX was discussed in *Bennett v. West Texas State University,* 525 F.Supp. 77 (N.D.Tex.1981), *appeal docketed,* No. 81–1398 (5th Cir. Aug. 28, 1981).

---

**23.** Comment, *HEW's Regulation Under Title IX of the Education Amendments of 1972: Ultra Vires Challenges,* 1976 B.Y.U.L.Rev. 133, 181 (citing 117 Cong.Rec. 39256 (1971) (Representative Steiger); *id.* (Representative Waggonner); *id.* at 30406 (Senator Dominick)).

**24.** Comment, note 22 *supra,* at 181–182. The court cited the repeated references to particular federal programs in support of its conclusion:

An even more substantial objection to HEW's interpretation of the term "program" is provided by the use of that term during Congressional debates on the statute and by HEW's own use of the term in the administrative regulations issued thereunder. In the Senate where the program limitation was initiated, reference was frequently made to the school lunch program, 110 Cong.Rec. 7101 (1964), to the agricultural extension program for home economics teachers, 110 Cong.Rec. 13126 (1964), to the farm-to-market road program, 110 Cong.Rec. 13331 (1964), to aid for vocational agriculture teaching, 110 Cong. Rec. 13126 (1964), and to aid to impacted school districts, 110 Cong.Rec. 7100 and 13126 (1964). Senator Eastland went so far as to introduce in the Congressional Record a long list of the federal programs to which the cutoff provision was applicable, 110 Cong.

Rec. 8359–8361 (1964), as did Congressmen Poff and Cramer in the House. 1964 U.S. Code Cong. & Ad.News, pp. 2470–2473. HEW in issuing regulations to implement the cutoff provision has followed a similar procedure. See 45 C.F.R. § 80.2 and 45 C.F.R. § 80.13, Appendix A. *All of these lists refer to particular grant statutes such as those before us, not to a collective concept known as a school program or a road program. Taken together they clearly contradict the notion that Congress intended the collectivization of all school subventions under the single rubric: "program or part thereof."* 414 F.2d at 1077 (emphasis added). In *Romeo Community Schools v. United States Dept. of Health, Education, and Welfare,* 438 F.Supp. 1021 (E.D.Mich.1977), *aff'd,* 600 F.2d 581 (6th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979), the district court relied on *Finch* to reject HEW's contention that the term "program or activity" as used in Section 901 refers to the entire operation of the educational institution. 438 F.Supp. at 1033–1034 n. 18. The court characterized the position of HEW as a "novel and protean interpretation of a well-established statutory term...." *Id.*

*Bennett* involved allegations by female students of West Texas State University that various policies and practices of the University discriminated against women on the basis of sex by denying women equal opportunities in the University's intercollegiate athletic program in violation of Title IX. The University contended, and the district court held, that the regulations exceeded the statutory authority granted under Title IX to the extent they purported to apply to the University's intercollegiate athletic program irrespective of the absence of direct federal financial assistance to that specific program. 525 F.Supp. at 78–80.[25] In addition, the district court held in *Bennett* that the University's athletic program did not receive *direct* federal financial assistance by virtue of the fact that University students received veterans' benefits, BEOG grants, work study money, and other federal financial aid. The plaintiffs' argument, identical to the argument raised by HEW in the instant case, was that the University's athletic program received federal financial assistance because the University received tuition from students that was supplied as grants or loans under the federal programs. The court's rationale for rejecting this argument is equally applicable to the case at hand:

> Plaintiffs' argument that such aid constitutes a direct benefit to the athletics programs is not well-taken. All types of federal aid enumerated by the Plaintiffs are general and nonspecific, and such aid is indirect by nature. The type of assistance relied on by Plaintiffs results in some benefit, however remote and indirect, to every program at West Texas State University. *Were the Court to adopt Plaintiffs' argument, the programmatic construction of Title IX would be rendered nugatory, because every program or activity at the university would be subject to Title IX.* The Act itself compels a different conclusion.

*Id.* at 80–81 (emphasis added).[26] Under the position taken by the plaintiffs in *Bennett* and HEW in the instant case, every program or activity of an educational institution that accepts students who receive federal financial assistance would be subjected to regulation under Title IX. If discrimination is found in a particular program or activity of the institution, such as the athletic program or the math department, the remedy, as sought in this instance by HEW, would be to terminate *all* student federal financial assistance. For the reasons stated herein, we find HEW's position to be inconsistent with the program-specific language of Sections 901 and 902 of Title IX. We further find that, to the extent the regulations adopt and effectuate HEW's position, they are in excess of statutory authority.

HEW and the Reviewing Authority rely primarily on the case of *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C. 1974), *aff'd without opinion,* 529 F.2d 514 (4th Cir.1975) in support of their position.[27] The court in *Bob Jones,* as previously noted, equated the statutory phrase "program or activity" found in Title VI with the entire

---

**25.** See also *Othen v. Ann Arbor School Bd.,* 507 F.Supp. 1376 (E.D.Mich.1981), *appeal docketed,* No. 81–1259 (6th Cir. April 22, 1981) (Title IX applies only to the specific class of educational program or activities which receive direct federal financial assistance); *cf. Haffer v. Temple University,* 524 F.Supp. 531 (E.D.Pa. 1981), *aff'd,* 688 F.2d 14 (3d Cir.1981) (university's intercollegiate athletic program, although not receiving federal funds directly, is subject to Title IX because the federal funds received elsewhere in the institution indirectly assist the athletic program).

**26.** The district court in *Haffer, supra,* reached the opposite conclusion, holding as an alternative basis for its decision that the University's athletic program received *direct* federal financial assistance by virtue of (1) work study funds provided to students and employees working in the athletic program, (2) BEOG, SEOG, NDSL, GSL, and work study funds received by University intercollegiate athletes, and (3) federal funds provided to finance buildings used by the athletic program. 524 F.Supp. at 540.

**27.** HEW Secretary Weinberger indicated during the hearings on the proposed regulations that the agency was "bound" by *Bob Jones* and its interpretation that student assistance constitutes federal financial assistance to the programs of an institution. *Hearings on Title IX,* note 22 *supra,* at 481–482.

University in holding that the veterans' benefits received by students at the University were "specifically tied to the beneficiary's participation in an educational program or activity." 396 F.Supp. at 602. As a result, the order of the Veterans Administration terminating the right of eligible veterans seeking education at Bob Jones University to receive veterans' benefits was affirmed.

We decline to follow the language in *Bob Jones* that an entire institution may be deemed the relevant "program or activity" to the extent that the language would purport to cover the circumstances of the case at hand. Two peculiar features of *Bob Jones* make it distinguishable from the instant case.

One factual distinction of *Bob Jones* is that it involved an admittedly discriminatory admission policy which served to deny entrance to the University to unmarried nonwhites. In *Othen v. Ann Arbor School Bd.,* 507 F.Supp. 1376 (E.D.Mich.1981), *appeal docketed,* No. 81–1259 (6th Cir. April 22, 1981), the district court found that the court in *Bob Jones* did not have to decide which University programs or activities were racially discriminatory because the University's admissions policy "tainted" all programs:

> Racial discrimination respecting acceptance or admission into educational institutions permeates all programs and activities within those institutions. Once racially discriminatory admission policies have been found to exist, the taint of racial discrimination affects all programs and activities within the particular institution. Therefore, the courts which have decided suits brought under Title VI did not have to carefully focus upon the institutional/programmatic conflict which is now squarely before this court.

507 F.Supp. at 1387.[28] In contrast, HEW argues here that the programs and activities of Hillsdale College may be subjected to Title IX because student federal financial assistance is used to pay tuition, which

in turn flows to all operations of the College. There is no allegation that the admissions policy at Hillsdale discriminates on the basis of sex; in fact, there is no allegation that Hillsdale has discriminated on the basis of sex in any manner.

A second feature of *Bob Jones* which distinguishes it from the present case concerns the constitutional dimension of the decision. The court, after noting that *"[e]ach time the VA approves an application for benefits to be used at Bob Jones, it extends a benefit to whites which it cannot grant to some blacks,"* held that "the federal government cannot, consistent with the Due Process Clause of the Fifth Amendment, provide direct grants-in-aid to public or private entities which discriminate on the basis of race. . . ." 396 F.Supp. at 608 (emphasis in original). Hence the decision in *Bob Jones* may fairly be read to have a constitutional underpinning above and beyond its statutory basis. See *Othen, supra,* at 1389. The position of HEW in the present case, in contrast, must rest on the statutory language of Title IX.

■ In *Grove City College v. Bell,* 687 F.2d 684 (3rd Cir.1982), which raised the same issue as that presented here, the majority of the panel held that under Title IX the entire college is a "program" and that, by virtue of the receipt by students of federal loans and grants which benefits the college, the college may properly be required to execute an Assurance of Compliance. This opinion relies in substantial measure on post-enactment legislative history. We disagree with the holding in *Grove City* for the reasons heretofore indicated. On the contrary, we are of the view that the "program," within the meaning of Title IX, is the federal loan and grant program for students. The reasoning of the majority in *Grove City* would equally apply if the federal government subsidized the athletic program at a college, allowing the college to use gate receipts to, for example, supplement faculty salaries and to create scholarships. We do not believe that Con-

---

**28.** Cf. *Haffer, supra,* at 539 (disagrees with *Othen* that Title VI discriminatory admissions cases did not have the institutional/programmatic dichotomy squarely at issue).

gress intended, in enacting Title IX, to authorize HEW pervasively to regulate entire colleges and universities because federal money benefits the entire institution.[29] Under the majority opinion in *Grove City*, the "program-specific" limitation set out by the Supreme Court in *North Haven* loses all of its practical meaning.

The concurring judge (Judge Becker) in *Grove City* thought that the majority opinion was too broadly based, contending that the only issue presented was whether the college could be required to execute the Assurance of Compliance. Judge Becker then asserts that the Assurance is itself program-specific, as is required by *North Haven*, because it applies, by its terms, only to an education program or activity for which the applicant receives or benefits from federal financial assistance. 687 F.2d at 705. Thus Judge Becker concludes that the regulation requiring the Assurance is valid because the Assurance is limited to programs receiving benefits from the federal government. The difficulty with Judge Becker's view is that it is HEW's very position that the entire college is a program and that by executing the Assurance, the college agrees to comply with regulations as they apply to the entire institution. Simply stated, it appears to us that it would be anomalous to hold that the college may be required to execute the Assurance because it is so limited by its terms when HEW construes the Assurance and its regulations to apply to the college as an institution, a position that is, in our view, not supportable under Title IX.

## VI. CONCLUSION

We agree with Hillsdale in part and HEW in part.

1. We agree with HEW that funds may be cut off without a finding that a college is actually discriminating on the basis of sex. Section 902 authorizes HEW to issue regulations to effectuate section 901 and further provides that compliance with the regulations may be enforced by cutting off of federal funds. The statute does *not* provide that funds may be cut off only upon a finding of actual discrimination.

2. We further agree with HEW that Hillsdale is a "recipient" within the meaning of section 901 and that, provided that the "program-specific" limitation in Title IX is met, it is subject to regulation.

3. We agree with Hillsdale's alternative contention that the entire college, as an institution, is not a "program" within the meaning of Title IX and that the "program" involved here is the student loan and grant program. Thus we agree that only the student loan and grant program is subject to Title IX regulation.

4. We agree with Hillsdale that the regulation requiring it to execute the Assurance of Compliance as a condition for its students receiving loans and grants is, as it is applied here, an invalid regulation. This is true because the regulation and the Assurance, as interpreted and applied by HEW, cover the entire college and are not limited to the student loan and grant program.

For reasons stated herein it is ORDERED that the reviewing authority's order be and the same is hereby Reversed.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

Respectfully, I dissent. This case involves interpretation of one of two principal

---

**29.** The regulations specify, in part, the high schools where Hillsdale may recruit students for admission (34 C.F.R. § 106.23), the literature that Hillsdale may provide to the students about the college (34 C.F.R. § 106.9), the tests which Hillsdale may require the students to take as a condition of admission (34 C.F.R. § 106.21(2)), how Hillsdale may use its own funds to aid the students (34 C.F.R. § 106.37), the students' access to course offerings (34 C.F.R. § 106.34), the manner in which the student is housed, whether on or off campus (34 C.F.R. § 106.32), the health services provided to students (34 C.F.R. § 106.39), the students' extracurricular activities (34 C.F.R. § 106.31(a)) and student athletic participation (34 C.F.R. § 106.41).

pieces of legislation [1] which Congress has yet adopted in order to grant equal rights to women. I would not give it the very narrow interpretation which is to be found in the majority opinion.

There is, of course, no doubt that reluctance (or worse) in interpretation of both constitution and law has greeted efforts to achieve equal rights for women throughout the history of this nation. Yet in this statute, Congress clearly intended to turn its back on that discreditable past. And in two important cases, the Supreme Court (by breadth of interpretation of Title IX) and the Third Circuit (in a decision directly on point) have done likewise. *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed. 299 (1982); *Grove City College v. Bell*, 687 F.2d 689 (3rd Cir.1982). I regret that my colleagues elect not to follow these cases.

Equality of all "citizens" or "persons" before the law is, one of the main themes of the Constitution of the United States. It has, however, taken a long time in the history of this country for women to be recognized as either "persons" or "citizens" in a constitutional and legal sense. And indeed that recognition is still not as complete in Supreme Court case law as it is in the case of black males.

Prior to the adoption of the Constitution, Abigail Adams in 1777 wrote to her husband John:

> In the new code of laws which I suppose it will be necessary for you to make, I desire you would remember the ladies and be more generous and favorable to them than your ancestors. Do not put such unlimited power into the hands of the husbands. Remember, all men would be tyrants if they could. If particular care and attention is not paid to the ladies, we are determined to foment a rebellion, and will not hold ourselves bound by any laws in which we have no voice or representation.

E. Flexner, Century of Struggle 15 (1974) quoting Adams, *Familiar Letters,* 149050. In the original Constitution, adopted at Philadelphia and ratified in 1787, Article IV, § 2, Clause 1 reads "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." Despite Abigail's entreaties, however, the "ladies" went unremembered. Just as blacks of that day whether freed or slave were not considered citizens for purpose of that grant of equality, so too, by common understanding, were women excluded, albeit, not by any specific constitutional language. When four years later, the new country enacted Amendment V of the Bill of Rights, it decreed as to all persons in the nation "no person shall be deprived of life, liberty or property without the due process of law." While the rights of women to due process of law in matters involving charges of crime or cases involving disputes over property were gradually established (largely as a result of the common laws' impact on the laws of the various states) they were still not considered "persons" or "citizens" in a full constitutional sense.

Women were *called* "persons" and "citizens" by the Court, but they were still not afforded full constitutional rights, particularly political rights, belonging to male persons or male citizens. For example the *Dred Scott* decision described the woman as "citizen" and referred to her as a person but treated her as a political eunuch. In the words of that Court, "Undoubtedly, a person may be a citizen, that is a member of the community who form the sovereignty although he exercises no share of the political power, and is incapacitated from holding particular offices. Women and minors, who form a part of the political family cannot vote ... yet they are citizens." *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 422, 15 L.Ed. 691 (1856).

In 1868, after the dreadful conflict of the Civil War and after the abolition of slavery, the fourteenth amendment was adopted and ratified. It read:

---

1. Directly involved is Title IX, 20 U.S.C. § 1681–86 (1978). The other Act is Title VII, Equal Employment Opportunity Act, 42 U.S.C. §§ 2000e *et seq.* (1981). *See also* the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1978).

All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges and immunities of any citizen of the United States nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction, the *equal protection of the laws*." U.S. Constitution, Amendment XIV, § 1 (Emphasis added).

On the face of this amendment, it would seem logical that women born or naturalized in the United States, were by virtue of the fourteenth amendment, citizens of the United States and of the states wherein they reside and consequently, that they could not be denied the equal protection of the laws.

Perhaps the most fundamental of the laws, however, were those which gave citizens the right to vote, yet the Supreme Court of 1874 had no trouble saying that no portion of the fourteenth amendment served to extend voting rights to women since they had never before had them. *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1874). Of course the fourteenth amendment could likewise have been regarded as a grant of voting rights to freed slaves. But that proposition seems to have been so far from public consciousness that in 1870 the fifteenth amendment was drafted and ratified in order specifically to accomplish that objective as to black males. The fifteenth amendment reads: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color or previous condition of servitude." Efforts to add "sex" as a forbidden basis for exclusion from the right to vote were brushed aside, and the fifteenth amendment made no reference to any rights that women, black or white, might have.

In fact women were denied the right to vote in both local, state and national elections until the great women's suffrage movement secured another constitutional amendment.[2] It was adopted and ratified in 1920. The nineteenth amendment reads: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."

The Constitutional Convention and the Congresses involved in these enactments were, of course, markedly male. So, too, was the Supreme Court until 1981 when Justice Sandra Day O'Connor was sworn in. As stated earlier although Supreme Court *theory* recognized women as "persons" and "citizens" its early decisions did not give that recognition much effect.

In *Bradwell v. Illinois,* 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1873), the Supreme Court held that Illinois could deny Bradwell the right to practice law solely because she was a woman. In *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1874), the Supreme Court held that the states could deny women the right to vote. In *Goesaert v. Cleary,* 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 the Supreme Court held Michigan could prohibit employment of women as bartenders. In *Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), the Supreme Court held that Florida could exclude women from jury service unless (unlike men), they voluntarily registered their availability.

In recent years a trend in the direction of equal rights for women has been recorded. Congress in 1964 adopted Title VII designed to give women equal employment opportunities. In 1972 it adopted the statute currently before us designed to give women equal educational opportunities.

In recent years also the Supreme Court's attitude toward women's right to equality before the law has altered. In *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Supreme Court held that state laws could not prefer males over equally qualified females for the position of

---

2. E. FLEXNER, CENTURY OF STRUGGLE (1974).

administrator of a decedent's estate. In *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), the Court [3] held that a female member of the military could not be denied the fringe benefits of housing allowance and medical benefits for her spouse given to male soldiers. In *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the Court [4] held that pregnant public school teachers could not be forced out of work at a fixed stage of pregnancy well in advance of term, nor be forced to wait to return to their jobs until a fixed period had elapsed. In *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Court held that laws which exclude women from jury service were invalid. In *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), the Court held that a statutory scheme providing husbands but not wives may be required to pay alimony was unconstitutionally discriminatory. These examples of recent cases seem to make it clear that governmental authority may no longer be used to accord women the inferior status they held under common law and past constitutional interpretation.[5]

This thumbnail sketch of women's battle for equality before the law of this country from Abigail Adams to Sandra O'Connor is designed to point out that women's rights to equal treatment under the Constitution of the United States are long overdue. When a heavily male dominated Congress finally came around to adopting two important pieces of legislation obviously designed to give women equal rights in education and employment, one of which is before this Court in this case, it ill-behooves the courts to approach such overdue remedial legislation with hostility.

Turning directly to this case, the key sentence of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–86 is: "No person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance...."

It should be noted at the outset that no charge that Hillsdale has actually discriminated against women is involved in this case. Hillsdale has simply refused to state that it will follow the law set forth above.

Since I agree with two of Judge Brown's conclusions for the reasons stated in his opinion, I can shorten this dissent. My concurrence runs to the following declaration of the majority:

1. We agree with HEW that funds may be cut off without a finding that a college is actually discriminating on the basis of sex. Section 902 authorizes HEW to issue regulations to effectuate section 901 and further provides that compliance with the regulations may be enforced by cutting off federal funds. The statute does *not* provide that funds may be cut off only upon a finding of actual discrimination.

2. We further agree with HEW that Hillsdale is a "recipient" within the meaning of section 901 and that ... it is subject to regulation.

As to the following conclusions of Judge Brown, I am in disagreement:

3. We agree with Hillsdale's alternative contention that the entire college, as an institution, is not a "program" within

3. In the *Frontiero* decision the four vote plurality opinion declared that gender based classifications were "inherently suspect" and therefore subject to "strict judicial scrutiny." 411 U.S. at 682, 93 S.Ct. at 1768. This standard of review, however, has not yet received the fifth vote.

4. Justice Stewart's opinion for the Court granted relief not on an equal protection basis but rather on due process grounds.

5. In a series of articles Ruth Bader Ginsberg has succinctly delineated the constitutional evolution of the equality principle as applied to women while commenting upon gender protectionism. *Sex Equality Under the Fourteenth Amendment and the Equal Rights Amendment,* 1979 Wash.U.L.Q. 161 (1979); *Sex Equality and the Constitution,* 52 Tul.L.Rev. 451 (1978); *Benign Classification in the Context of Sex Discrimination,* 10 Conn.L.Rev. 813 (1978); *Gender and the Constitution,* 44 Cin.L.Rev. 1 (1975).

434

the meaning of Title IX and that the "program" involved here is the student loan and grant program. Thus, we agree that only the student loan and grant program is subject to Title IX regulation.
. 4. We agree with Hillsdale that the regulation requiring it to execute the Assurance of Compliance as a condition for its students receiving loans and grants is, as it is applied here, an invalid regulation. This is true because the regulation and the Assurance, as interpreted and applied by HEW, cover the entire college and are not limited to the student loan and grant program.

### Educational Activities as a Title IX "Program"

Federal funding which is involved in this appeal consists of the receipt by Hillsdale of funds for the operation of the college from student fees paid as a result of four separate federal grant programs. These are the National Direct Student Loan Program, hereinafter to be referred to as NDSL, 20 U.S.C. § 1087aa *et seq.;* the Basic Educational Opportunity Grant Program, hereinafter BEOG, 20 U.S.C. § 1070; the Supplemental Educational Opportunity Grant Program, hereinafter SEOG; 20 U.S.C. 1070(b) and the Guaranteed Student Loan Program, hereinafter GSL; 20 U.S.C. § 1071 *et seq.* Under two of these programs, NDSL and SEOG, the Department provides funds directly to Hillsdale College. The college then distributes the funds in the form of scholarships to qualified students. Portions of or all of such scholarship funds are then paid to the college by the students as tuition, room and board, etc. Under the BEOG Program, HEW funds are provided directly to eligible students and are subsequently paid to Hillsdale for tuition, room and board, etc. The GSL Program is distinct from the other three. Under it students apply for low interest loans from private lending institutions. The loans are guaranteed in whole or in part by the United States Government which pays interest

on the loans throughout the student's education.[6]

All of the programs referred to above require that Hillsdale certify that the student who is the ultimate recipient is enrolled in college. Under two of the programs, NDSL and SEOG, HEW pays the funds directly to Hillsdale which then distributes the federal subsidies to qualified students. Under BEOG, HEW funds are provided directly to eligible students who in turn use them to defray their college expenses. HEW advises that in the year ending June 30, 1978 approximately one-fourth of the Hillsdale student body received aid under these various programs.

It seems clear to me that each of these programs provides funds which when paid to the college are used for the general support of the educational program of the college as a whole.

Section 1681(a) of Title IX provides as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance...." Under the circumstances outlined above, it seems obvious to me that Congress intended for its prohibition on sex discrimination to apply to a college like Hillsdale when it was "receiving Federal financial assistance" in the fashion Hillsdale is receiving such.

In the recent decision by the Supreme Court in *North Haven Bd. of Educ. v. Bell, supra,* the Supreme Court of the United States held that discrimination against female employees of a school receiving federal funds was barred. The critical language of Justice Blackmun's opinion for a total of six justices of the Supreme Court bears quotation at this point:

Our starting point in determining the scope of Title IX is, of course, the statutory language. See *Greyhound Corp. v. Mt. Hood Stages,* 437 U.S. 322, 330, 98

**6.** Since § 1685 of the statute exempts from remedy programs affected by "contract of insurance" or "guaranty," this opinion does not

rely upon the GSL funding in affirming the Secretary.

S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). Section 901(a)'s broad directive that "no person" may be discriminated against on the basis of gender appears on its face, to include employees as well as students. Under that provision, employees, like other "persons," may not be "excluded from participation in," "denied the benefits of," or "subjected to discrimination under" education programs receiving federal financial support.

Employees who directly participate in federal programs or who directly benefit from federal grants, loans, or contracts clearly fall within the first two protective categories described in § 901(a). See *Isleboro School Comm. v. Califano*, 593 F.2d 424, 426 (CA1), cert. denied, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979). In addition, a female employee who works in a federally funded education program is "subjected to discrimination under" that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues. See *Dougherty Cty. School System v. Harris*, 622 F.2d 735, 737–738 (CA5 1980), cert. pending sub nom. *Bell v. Dougherty Cty. School System*, —— U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280.

There is no doubt that "if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." *United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966); see also *Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 1795, 29 L.Ed.2d 338 (1971); *Daniel v. Paul*, 395 U.S. 298, 307–308, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968); *Piedmont & Northern Ry. v. ICC*, 286 U.S. 299, 311–312, 52 S.Ct. 541,

545, 76 L.Ed. 1115 (1932). Because § 901(a) neither expressly nor impliedly excludes employees from its reach, we should interpret the provision as covering and protecting these "persons" unless other considerations counsel to the contrary. After all, Congress easily could have substituted "student" or "beneficiary" for the word "person" if it had wished to restrict the scope of § 901(a). (Emphasis added).

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521, 102 S.Ct. 1912, 1917–18, 72 L.Ed. 2d 299 (1982).

It seems obvious to me that the Supreme Court's opinion quoted above directly rejects Judge Brown's conclusion in this case that the prohibition of sex discrimination in the statute is 1) solely directed at the financial grant programs and 2) cannot properly be applied to prohibit sex discrimination in the entire educational institution. Clearly the court's application of the sex discrimination ban to all employees of the school (including those not directly involved in the educational process)[7] was a much wider interpretation of the statute than HEW has followed in our instant case.

The majority opinion continued to find in the broad language of the sponsors of Title IX support for including employee discrimination within Title IX's prohibition of sex discrimination in educational activities. Without repeating the Court's legislative history or its postenactment history, I incorporate Sections B and C of the majority opinion by reference and rely upon the majority's obvious inclination to give the statute its full intended effect.

I now turn to the Third Circuit's treatment of the identical problem which we face in our instant case. There, as here, the educational institution concerned objected vigorously to any "generalized nonprogram-

---

**7.** Before terminating this discussion of the impact of *North Haven* upon our instant case, I would point out (as did the dissenter in that case) that the majority opinion swept broadly enough to include within those employees of the college as to whom discrimination on the basis of gender was prohibited, not only teach-

ers and administrators who were immediate participants in the educational process but also employees like secretaries and janitors who were neither direct participants in the educational process nor recipients thereof. 102 S.Ct. at 1928 (Powell, J., dissenting).

matic, or institutional basis" for Title IX application. Judge Garth's opinion, with which I am in complete agreement, dealt with the "program specific" argument which my colleagues emphasize by adopting the response filed by the American Association of University Women:

> However the Supreme Court ultimately defines "program", it cannot conclude that the more general the scope and purpose of the funding, the more restrictive the coverage of this remedial civil rights statute will be. That result would be logically inconsistent. Yet Grove City asks this court to decide that an institution whose entire purpose is educational is exempt from coverage when it is financed with federal funds that can be used for virtually any educational purpose instead of a clearly limited function. The absurd result if this approach is followed to its logical conclusion is that general higher education aid would never bring the college under Title IX coverage because no specific program within the College would be earmarked to benefit from the federal funding.

*Grove City College v. Bell,* 687 F.2d 684, 698 (3rd Cir.1982).

In addition Judge Garth quoted another commentator to support his result:

> [I]f two programs, one receiving federal aid directly and one not, are both administered by the same local agency for the education of essentially the same group of students, and if the funding of the former facilitates the latter by freeing funds for its use, or if discrimination in the latter affects the former by inhibiting or prohibiting a student's participation in that program, then both will be considered part of the same program for purposes of bringing the latter within the reach of Title IX.

*Grove City College v. Bell,* 687 F.2d 684, 698–99 (1982), quoting Todd, *Title IX of the 1972 Education Amendments: Preventing Sex Discrimination in Public Schools,* 55 Texas L.Rev. 103, 112 (1974).

Judge Garth concluded his discussion of the "program specific" issue in the following manner:

> Where the federal government furnishes indirect or non-earmarked aid to an institution, it is apparent to us that the institution itself must be the "program." Were it otherwise, and if it had to be demonstrated that each individual component of an integrated educational institution had in fact received the particular monies for a particular purpose, no termination sanction could ever effectively be imposed.
>
> We conclude that the remedy to be ordered for failure to comply with Title IX is as extensive as the program benefited by the federal funds involved. Because the federal grants made to Grove's students necessarily inure to the benefit of the entire College, the "program" here must be defined as the entire institution of Grove City College. Thus, Grove is incorrect in claiming that the program-specific provisions of the statute preclude Title IX coverage when indirect aid is involved.

*Grove City College v. Bell,* 687 F.2d 684, 700–01 (3rd Cir.1982).

There is no reason why the government of the United States should grant funds to colleges which refuse to certify that they intend in using those funds to obey the laws of this country prohibiting discrimination against females. Hillsdale College, has, of course, a right to refuse to sign such a certificate. But equally clearly Hillsdale should have no right to relief in the federal courts to secure federal financing of its general educational program where it refuses to indicate, as required, that it will comply with federal Title IX mandates.

Title IX and Title VII are closely related statutes designed to give broad equal protection rights which a long history of discrimination has denied to women and minorities. The enactment of Title IX in 1972 forbidding discrimination against women in education was patterned after Title VI of the Civil Rights Act of 1964 which proscribed discrimination in any federally assisted program on the basis of race, color, or national origin; both statutes have parallel

prohibitions and identical enforcement mechanisms similarly described.[8] In fact, "the drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI has been during the preceding eight years." ·Cannon v. University of Chicago, 441 U.S. 677, 696, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979). Moreover the goals to which the statutes aspire are indeed similar. "Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices." Id. at 704, 99 S.Ct. at 1961. Thus, as a final argument for an interpretation of the important statute before us that would not annul its broad nondiscriminatory purpose, the words of Senator Humphrey, one of the Senate sponsors of Title VI, as quoted by the Supreme Court, are apposite, substituting only the word sex for the word race.

> Simple justice requires that public funds, to which all taxpayers of [both sexes] contribute, not be spent in any fashion which encourages, entrenches, subsidizes or results in [sex] discrimination.

Lau v. Nichols, 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974).

Simple justice, recognition of Title IX's basic and broad remedial purpose and the other foregoing reasons dictate that I dissent from my colleagues' disturbingly narrow interpretation of this remedial statute. I would affirm the constitutionality of Title IX as applied in this case and the legality of the regulations issued by HEW which are in dispute.

If I were writing for the majority of this court, I would also remand to the agency for careful consideration of the timing of its order cutting off funds. Accordingly I suggest fund termination that will not affect students presently enrolled but only those who may enter in the future. At issue in this regard could be severe impact upon the education of students who are not in any way responsible for this controversy. Additionally it may well be that the college itself will see fit to comply with the agency's regulation at the beginning of the school year after the regulation's legality and constitutionality are completely established.

This less harsh prospective remedy appears to be consistent with the Title IX statutory scheme. Indeed, the remedies portion of the Act, Section 902, 20 U.S.C. § 1682 (1976), provides that compliance with the statute "may be effected" by termination of funding or "by any other means authorized by law." (emphasis added). Agency adoption of the suggested equitable remedy would be one which is "authorized by law" and would fall within the permissive grant of authority to fashion remedies. This conclusion is buttressed by the Supreme Court's observation in Cannon v. University of Chicago, 441 U.S. 677, 704–05 n.n. 38 & 39, 99 S.Ct. 1946, 1961–62 n.n. 38 & 39, 60 L.Ed.2d 560 (1979), that Congress intended the use of measures less severe than total fund cutoff where the statutory objectives of Title IX could be furthered by less heroic means.

---

**8.** Compare 20 U.S.C. §§ 1681–82 (Title IX) with 42 U.S.C. §§ 2000d–2000d–1. (Title VI).